I.
This sale-of-marijuana/entrapment case presents a narrow question of evidentiary sufficiency, viz. whether the evidence of that form of official misconduct which has come to be known as "supply and buy" is such that the trial court was in law obligated to direct a verdict of acquittal. Sensitively assessed, the evidence stands uncontradicted, undisputed and unimpeached, that a paid confidential informant working for the state supplied marijuana to the accused, which an undercover police officer purchased from him two days later. There being no substantial evidence of predisposition *Page 25 
to sell, settled law requires that we reverse.
 II. A.
This case arose in February of 1985. Pinkie Albert Pulliam was renting a small cafe on Bratton Road, west of New Albany, in rural Union County, Mississippi. He was open for business only in the latter part of the week, usually Thursday through Saturday, sometimes stretching from Wednesday to Sunday nights. The cafe sold catfish plates and chitterlings. Pulliam says on the average ten to twenty "friends" would drop by each night.
Without dispute, very late on the evening of Friday, February 7, 1985, Pulliam was at his home in New Albany when he received a telephone call from a woman named Susan Self, whom he had known for some time. It seems that Self had dated a man named Barron McKinnon, who was Pulliam's close friend. Pulliam claims a distant kinship with Self, viz., there is a "blood relationship between her nephews and my daddy's nephews." Self had often been to Pulliam's cafe. In any event, on the Friday in question, Pulliam had just returned home from Holly Springs where he had been playing in a basketball tournament when the phone rang and Self was on the line. Self said she had a cousin in town visiting with her who wanted to buy some marijuana. According to Pulliam, Self said two nights earlier she had left a bag containing a quarter pound of marijuana out at the cafe, and she asked Pulliam to meet her and her cousin there and "sell" them the marijuana. Self said she did not want her cousin to know the marijuana was hers or that she was selling it.
In point of fact, Susan Self was a paid confidential informant assisting the Mississippi Bureau of Narcotics (MBN) and other law enforcement agencies in undercover investigations in the Union and Prentiss County areas. She worked with Susan Reifers, then a policewoman employed by the Tupelo Police Department. At about 12:25 a.m. on Saturday, February 8, 1985, Self and Reifers, posing as Self's cousin, arrived at the cafe. Moments later, Pulliam arrived, and the three went inside. There is no question but that, before they left, Pulliam had caused to be delivered a bag containing a quarter of a pound of marijuana, for which Reifers had paid Pulliam $230.00. Pulliam says not only was he entrapped, in the sense that Self and Reifers tricked him into "selling" marijuana when he had no predisposition to do so, but in the further sense that Self, acting as a confidential informer for the state, supplied the marijuana he "sold." In point of fact, Pulliam claims that the marijuana was never his, that it belonged to Self all the while, and that later that morning, February 8, Pulliam saw Self and gave her the money.
 B.
Law enforcement authorities took a different view of the matter and on April 2, 1985, the grand jury of Union County returned an indictment charging that Pinkie Albert Pulliam, on February 8, 1985,
 did unlawfully and feloniously and wilfully sell to Susan Reifers, in exchange for two hundred thirty dollars United States currency, a controlled substance, to-wit: 101 grams of marijuana.
See Miss. Code Ann. §§ 41-29-113(c)(12), -139(a)(1) and (b)(2) (Supp. 1985). In due course, Pulliam was brought to trial in the Circuit Court of Union County and found guilty as charged. On appeal, we found that the Circuit Court had impermissibly restricted Pulliam's cross-examination of Susan Self directed at her bias and prejudice. We reversed and remanded for a new trial.Pulliam v. State, 515 So.2d 945, 947 (Miss. 1987).
On March 10, 1988, Pulliam stood trial again. The prosecution solved the problem which had precipitated our original reversal rather simply: it did not call Susan Self as a witness. Rather, the prosecution proceeded straightforwardly through the testimony of Susan Reifers, the Bureau of Narcotics officer who had directed the investigation, and an MBN chemical analyst. Pulliam again testified in his defense and repeated his story of entrapment and official *Page 26 
misconduct. The jury found Pulliam guilty and the Circuit Court sentenced him to eighteen years in the custody of the Mississippi Department of Corrections, with the last ten years of the sentence suspended conditioned upon Pulliam's good behavior.
Pulliam appeals once again.
 III.
Our question is whether the Circuit Court erred in denying Pulliam's post-trial motion for judgment of acquittal notwithstanding the verdict.[1] This motion challenges the legal sufficiency of the evidence and, of course, was but a renewal of his pre-verdict motion for a directed verdict of acquittal.
We state the question and say at once that the evidence, without dispute, shows Pulliam delivered 94.9 grams of marijuana to Reifers and received in exchange $230.00. Pulliam thus sold a controlled substance, the sale and distribution of which has been made unlawful. See, e.g., Tanner v. State, 566 So.2d 1246, 1247 (Miss. 1990); Temple v. State, 498 So.2d 379, 381 (Miss. 1986);Pate v. State, 419 So.2d 1324, 1326 (Miss. 1982). The prosecution says Pulliam physically delivered the marijuana to Reifers, while Pulliam says Self picked up the bag and handed it to Reifers. The point is of no moment, as Pulliam concedes he caused the marijuana to be delivered and received the $230.00.
Still, Pulliam says on the present record he is of right entitled to discharge. He begins by invoking the familiar defense of entrapment.
 The word "entrapment," as a defense, has come to mean the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him in its commission and prosecuting him for the offense.
Avery v. State, 548 So.2d 385, 387 (Miss. 1989), cited inTanner v. State, 566 So.2d at 1248, and numerous other cases. By way of contrast, an accused enjoys no immunity from conviction where agents of the state merely furnished him the occasion for committing an offense he was predisposed to commit. See, e.g.,Avery v. State, 548 So.2d at 387; Ervin v. State,431 So.2d 130, 134 (Miss. 1983).
A single state agent may entrap a person by successfully persuading that person to commit an illegal act the person was not theretofore predisposed to commit. See, e.g., Kemp v.State, 518 So.2d 656 (Miss. 1988); Phillips v. State,493 So.2d 350, 354 (Miss. 1986). In the drug enforcement area, we encounter from time to time an egregious form of entrapment wherein persons acting for the state both "supply the controlled substance to the accused" and then "buy" it from him. In a long line of cases, we have made clear that we regard this a form of official misconduct which must be condemned and that, in the absence of a substantial showing of the defendant's predisposition for drug trafficking, the courts must acquit. SeeTanner v. State, 566 So.2d at 1249; Gamble v. State,543 So.2d 184 (Miss. 1989), back through and including Sylar v. State,340 So.2d 10 (Miss. 1976); see also, Moore v. State,534 So.2d 557, 559-60 (Miss. 1988).
Today's is not an occasion for (re)considering our substantive law of entrapment or (re)delimiting those occasions of official misconduct which will require reversal. Rather, we apply these settled principles, recognizing that they direct what are essentially factual inquiries which were presented to the jury below. Here, of course, we speak in the setting of familiar rules regarding our scope of review, that, on appeal, we must view the evidence in the light most consistent with the verdict, giving the prosecution the benefit of all reasonable favorable inferences consistent with the verdict. When we say that a defendant has been entrapped as a matter of law, what we mean is that the evidence, so viewed, is so clear that no fair-minded juror could, consistent with his oath, reject the entrapment defense.
In the supply-and-buy context, we have more than once confronted the circumstance where the sole evidence that the *Page 27 
state supplied the controlled substance comes from the defendant. Consistent with our general scope of review, we have recognized a narrow set of circumstances where the defendant's testimony in this regard may be adequate that the trial court has no authority to submit the case to the jury.
In Gamble v. State, the defendant testified that the state's confidential informant had furnished the marijuana the defendant later sold to a state agent. The prosecution offered nothing to rebut this, arguing merely that the jury had a right to disbelieve the defendant. We reversed and discharged and en route said:
 Had the state rebutted the testimony of appellant [here Pulliam] by calling the McKee [here Self] or by some other credible evidence, the lower court properly would have declined to sustain the motion for directed verdict. However, where the evidence stands uncontradicted, undisputed and unimpeached, even though the jury may not have believed the appellant, that testimony stands and makes out the defense. In cases such as this, prosecutors must have rebuttal evidence at hand to refute such testimony.
Gamble v. State, 543 So.2d at 185.
We reiterated this view in Tanner v. State, 566 So.2d at 1248. In Tanner the defendant testified that the marijuana belonged to Cooper, the confidential informant, who had left it with Tanner "for safekeeping." The prosecution did not rebut this, and our opinion reflects:
 No other witness for the prosecution offered direct testimony regarding the source of the marijuana.
We cited Gamble and our supply-and-buy cases dating back toSylar v. State, 340 So.2d 10 (Miss. 1976), and again ordered the defendant discharged.
We focus upon Gamble's teaching that the defendant is entitled to discharge only
 where the evidence stands uncontradicted, undisputed, and unimpeached.
We understand this teaching in the context of our long-settled law that a jury has no right to disregard arbitrarily evidence that is uncontradicted and not unreasonable or improbable on its face.
McLeod v. State, 140 Miss. 897, 901, 105 So. 757 (1925); seealso, Heidel v. State, 587 So.2d 835 (Miss. 1991); Harveston v.State, 493 So.2d 365, 370 (Miss. 1986); Fortenberry v. State,216 Miss. 243, 251, 62 So.2d 325, 327 (1953); Weathersby v.State, 165 Miss. 207, 209, 147 So. 481, 482 (1933).
There can be no question that, if Pulliam's testimony must be accepted, he is entitled to discharge. We review it under theGamble standard, and, when we do so, we find but one point where the prosecution offered conflicting testimony, and that is, the point noted above that Reifers says Pulliam handed her the marijuana and Pulliam says Self handed Reifers the marijuana. In view of Pulliam's free concession that Self acted at his direction and that he paid for the marijuana, the discrepancy seems of little moment.
The more serious question becomes whether, when we review Pulliam's testimony in its entirety, we must say it is not unreasonable or improbable or impeached.
We must look at Pulliam's story with some care. Pulliam says that on the evening of Wednesday, February 5, 1985, he was at his cafe when around 6:30 or 7:00 p.m., Susan Self appeared carrying a large brown bag. Pulliam noticed a bottle of liquor in it and says also that Self pulled out a can of beer and handed it to him. He says he did not know what else was in the bag. Pulliam says he left shortly thereafter to go to Oxford to play in a basketball game and that, when he left, Susan Self was still at the cafe, and the bag was sitting on a counter. Pulliam says he did not go to his cafe on Thursday and that after having left Wednesday to go to the basketball game in Oxford, the next time he set foot on the premises was late Friday night when he went there to meet Self and Reifers.
Pulliam's description of what happened on the night of the "sale" goes like this:
 When I arrived, they were sitting in the car waiting on me outside the cafe. When I got out, they came in. Susan *Page 28 
(Self) was talking to me like she was very excited about having a good time and everything, and wanted me to meet her cousin, and I went to the door. We went in, and I turned the stereo on, and we danced around a little bit. I offered them some wine or something to drink to make it a casual acquaintance. During the time we were there, Susan stepped to the side and told me that the young lady wanted to meet me; she had heard about me from her sister in Memphis. From that point on, I offered them, like I said, I offered them some wine. I offered them some personal marijuana that I smoke myself.
 . . . . .
 The action that happened on that was that she asked me was it any way she could cop some marijuana. I said, yeah, well, there's some marijuana around, and Susan winked her eye at me because she had told me in the bathroom at my place that if I would go along with selling the marijuana, making it out like it was my marijuana, that she was going to give me some information on a incident that happened at . . . I was involved with an investigation with the F.B.I. when boys drowned in New Albany.
 . . . . .
 Susan told me she didn't want her cousin to know that she was selling marijuana herself. She told me that if she found that out, that maybe she would . . . her cousin would tell her sister, and it would get back to her mother that she was selling drugs.
The specifics of the sale are, first, that Pulliam says he told Reifers a quarter of a pound of marijuana normally sold for $250.00. Reifers offered to buy the quarter pound for $230.00. Taking Self's wink as his cue, Pulliam agreed to the price. Reifers paid with three one-hundred dollar bills. Pulliam pulled $70.00 from his own pocket and handed it to Reifers.
Pulliam said he later noticed that one of the hundred dollar bills he had been given was counterfeit. He called Self to complain on grounds this created the risk that he, Pulliam, would be out $70.00. He says he met with Self later that Saturday and returned to her the bills Reifers had given him and received back from Self his "change."
In reply, the prosecution struggles mightily to establish that Pulliam's story was contradicted and impeached and was otherwise unreasonable or implausible. First, we are told that the Sheriff of Union County conducted a thorough search of Susan Self before the sale on Friday, February 7. This, however, does not contradict Pulliam's testimony that Self brought the marijuana to the cafe on the Wednesday before. That Reifers says Pulliam handed her the marijuana while Pulliam says Self did so at his direction is a discrepancy in detail of no consequence, as we have noted.
Next, we are told Pulliam admitted that he personally used marijuana. In point of fact, Pulliam did say this, and said that from time to time he would buy enough for his use and perhaps enough to share with a friend, but he denied that he ever sold. The point is without punch. That one buys whiskey or wine or cigarettes or Coca Cola for one's personal use hardly suggests that one illegally sells these items.
Beyond all of this, we have looked carefully at Pulliam's story that Self brought the marijuana in a brown bag Wednesday night, that the reason he cooperated with Self on Friday night in making the sale had to do with an FBI investigation of the death of a black youth in Union County[2], and, as well, Pulliam's testimony that this was not the first occasion when Union County law enforcement authorities tried to entrap him into selling drugs. Candor requires concession that we may doubt much of this story, but the law does not allow such speculative doubt. The short answer is that we may not fairly say that Pulliam's story is inherently implausible or unreasonable, nor has it been impeached. As Gamble makes clear, the fact that the *Page 29 
jury may not have believed Pulliam, without more, does not defeat his defense. Gamble, 543 So.2d at 186, cited in Tanner, 566 So.2d at 1249. This distinguishes this case from Robinson v.State, 508 So.2d 1067 (Miss. 1987), for in this case Pulliam did not "fail . . . to offer uncontradicted evidence to the jury on the legal question." Robinson, 508 So.2d at 1069. We may only repeat Gamble's admonition that "prosecutors must have rebuttal evidence at hand to refute such testimony." Gamble, 543 So.2d at 185, cited in Tanner, 566 So.2d at 1248.
Nothing said here suggests that a controlled substance prosecution will always fail unless the confidential informant appears and testifies as a witness. See Barrett v. State,482 So.2d 239, 240 (Miss. 1986); Copeland v. State, 423 So.2d 1333, 1335-36 (Miss. 1982). This is not a case where the informant had long disappeared and after diligent search could not be found. In point of fact, the informant appeared and testified at the first trial, and we are at a loss to understand why she was not at least available for (rebuttal) testimony at the second trial. Moreover, Pulliam had offered his entrapment defense at his first trial, and prosecuting attorneys should reasonably have suspected he would do the same at the trial in issue.
Without further ado, a faithful reading of Gamble andTanner and the other cases cited above, applied to the present record, compels the conclusion that Pinkie Albert Pulliam was entrapped by Susan Self and Susan Reifers, that he had no predisposition to sell marijuana, and that representatives of the state have been guilty of official misconduct sufficient that Pulliam must be discharged.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
[1] This motion is incorporated within Pulliam's motion for a new trial filed March 17, 1988.
[2] Pulliam testified that he had been the one who approached the FBI over the fact that nothing was being done by local law enforcement to investigate the death.