912 So.2d 1018 (2005)
Kevin B. BURNSIDE, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-00201-COA.
Court of Appeals of Mississippi.
March 22, 2005.
Rehearing Denied May 17, 2005.
Certiorari Denied October 20, 2005.
*1021 William Mitchell Moran, attorney for appellant.
Office of the Attorney General, by Billy L. Gore, attorney for appellee.
Before BRIDGES, P.J., MYERS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Kevin Burnside was found guilty of two counts of the sale of methamphetamine by a Leake County Circuit Court jury, which rejected his entrapment defense. He was sentenced to ten years on each count with the sentences to run consecutively and with five years suspended all in the custody of the Mississippi Department of Corrections. Burnside appeals, citing as error the trial court's refusal to grant a mistrial for an inappropriate statement by the prosecutor on voir dire, the trial court's refusal to grant a continuance respecting an undisclosed prosecution witness, three issues regarding empaneling of the jury, and one issue respecting a refused jury instruction. Finding no error, we affirm.

STATEMENT OF FACTS
¶ 2. While acting as a confidential informant, Tiffany Smith[1] purchased methamphetamine from Kevin Burnside in the Vowell's Supermarket parking lot in Carthage, Mississippi on two separate occasions, July 18, 2001 and August 22, 2001. Each of these transactions took place after a pre-buy meeting with Joey Mays, an agent with the Mississippi Bureau of Narcotics, and Greg Waggoner, Sheriff of Leake County. Smith was wired for sound, and both transactions were video and audio taped by Sheriff Waggoner, who along with Mays provided surveillance during the drug purchases.
¶ 3. Burnside drove to the July 18th transaction in a maroon Ford Escort. Smith pulled her car along side Burnside's car, asked "how much?" and gave him $100; in return, Burnside tossed methamphetamine in Smith's car. After the transaction was completed, Smith relinquished the contraband to Mays and Waggoner during a post-buy meeting. The second transaction took place on August 22, 2001. This time Burnside was driving a Chevrolet pickup. Burnside pulled along side Smith's car. A few minutes later, a white Geo Tracker pulled up to the other side of Burnside's vehicle. The unidentified third party driving the white vehicle got into Burnside's pickup, stayed for less than a minute, exited the pickup and left the scene. At this time, Smith gave Burnside $100 to purchase drugs. Once again, Burnside tossed the methamphetamine into Smith's car, and Smith relinquished the drugs to Mays and Waggoner during their post-buy meeting.
¶ 4. Burnside was subsequently indicted on two counts of the sale and delivery of methamphetamine. At trial, the videotaped recordings of the two transactions were played for the jury. Agent Mays testified as to the making of the videotapes and his personal observation of the transactions. As to the August 22, 2001 transaction, *1022 Mays testified that although law enforcement attempted to learn the identity of the driver of the white vehicle, the confidential informant was unaware of his identity. In addition, Mays and Sheriff Waggoner testified they were not able to leave the surveillance scene where there was an informant to try to follow the vehicle. When asked on cross-examination whether the driver of the white vehicle could have been working as an agent of the State, Agent Mays responded, "No, sir, they were not." When further questioned whether the driver of the white vehicle was Brent White, Agent Mays testified that from information law enforcement received, "it possibly was him." Mays continued that Brent White has been arrested on some drug related charges but was not arrested with respect to this transaction. Sheriff Waggoner later testified that "I can't testify this day exactly who it was [in the white vehicle]." He further testified, without objection, that Smith had informed him that she had been purchasing drugs from Burnside "for a year or more" and that the August 22, 2001 transaction occurred as a result of Burnside's calling Smith, and telling her "he had some meth for sale." Both Mays and Waggoner disavowed any knowledge of threats or coercion by Smith to induce the sales by Burnside.
¶ 5. Smith testified that she had been involved in an adulterous sexual relationship with Burnside, who first introduced her to crystal methamphetamine. He gave the drug to her on the first occasion and thereafter either sold or gave her the drug approximately once a week; most of the time, Smith purchased the drug from Burnside for $100 for a gram. She denied ever having to threaten Burnside or promise him anything to lure him into selling her drugs. Smith testified that following an overdose on crystal methamphetamine in July 2001 (in which Burnside was not involved), she advised Sheriff Waggoner that she wanted "to help stop the problem." Thereafter, she became a confidential informant, contacted Burnside and asked if he had any drugs to sell. His positive response led to the July 18 transaction. Smith testified that Burnside instigated the August 22 sale by calling Smith and telling her that he had some drugs if she wanted to buy some. As to the white vehicle which appeared during this second transaction, Smith testified that "[i]t looked like ... that guy in the other vehicle gave the defendant money." On cross-examination, Smith denied threatening "to get even" with Burnside and denied telling him that she was "strung out," needed drugs and would leave him alone if he would do her "this favor."
¶ 6. Burnside presented an entrapment defense at trial, arguing that he had no predisposition to sell drugs. Burnside testified that he began having an affair with Smith while she was employed at his mother's restaurant. He admitted to having smoked marijuana with Smith on one occasion. He testified that he "was trying to break it off with her, [because] she was seeing everybody in Carthage" but that Smith continued to call and try to see him; he estimated that Smith "called like a hundred times a month." Burnside testified that once, when he did return her call, Smith "said I'm in bad shape. I got to have some stuff and you told me you're going to get me some. Said I'm going to go and call your wife and tell her what we been doing if you don't come on and do something." He continued that since he and his wife were "getting things sort of worked out ... I didn't need that trouble again. I done been through all that junk with her and my wife. . . ." Accordingly, in order to keep Smith from telling his wife that they were having an affair, Burnside testified that he "tried to set up arrangement" *1023 to get Smith together with Brent White, an individual Burnside, a bail bondsman, had previously bonded out of jail on a drug charge. Burnside claimed that he was only a middle man between Smith and White and never had any of the drug money pass through his hands. Thus, Burnside felt he demonstrated that he had no predisposition to sell drugs, but that he was induced by the State to participate in the two transactions in question.
¶ 7. To counter Burnside's testimony, the State offered the rebuttal evidence of Patsy Savell-Thornton who testified that Burnside had sold drugs to her on previous occasions, the last time being in the latter part of 1999. Thornton testified that while she had been a previous drug user, she had "been clean for two and a half years and I've done two bumps of dope since then and I've smoked marijuana twice since then." On cross-examination, Thornton explained that she had been in the circuit court within the past "two weeks over my own trial that we was in with my mother-in law shooting me," and that the previous day, she had been contacted by the sheriff's department about testifying against Burnside. She admitted that her son was currently in the county jail. In surrebuttal, Burnside testified that he had not seen Thornton for five or six years and denied ever having sold her drugs.
¶ 8. The jury then returned a verdict of guilty on each count. Burnside filed a motion for new trial and subsequently a motion for judgment notwithstanding the verdict and/or mistrial and declare the defendant not guilty for misconduct, which counsel for Burnside admitted had the "same ... substance" as the first motion. Following a post-trial hearing in which numerous issues and witnesses were presented, the circuit judge denied the defendant's motion for new trial and allowed the verdict to remain undisturbed.

ISSUES AND ANALYSIS

I. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN NOT DECLARING A MISTRIAL FOLLOWING THE PROSECUTOR'S IMPROPER STATEMENT ON VOIR DIRE.
¶ 9. In his opening remarks during voir dire, the prosecutor made the following incorrect statement of law: "before the defendant in this case or in any other case can utilize the defense of entrapment they have to admit that they did what they're charged with." The prosecutor's statement was improper in two respects. First, Rule 3.05 of the Mississippi Uniform Circuit and County Court Rules of Practice prohibits an attorney from offering "an opinion of the law" during voir dire. Second, Hopson v. State, 625 So.2d 395, 400 (Miss.1993) abolished the requirement that a defendant must admit the offense charged in order to use an entrapment defense. Burnside immediately objected to the statement, and the trial judge sustained the objection. At the end of voir dire, Burnside made a motion for mistrial respecting the earlier statement. The trial court overruled the motion but gave a limiting instruction to the jury concerning the "improper statement" before the trial began and questioned the jury as to whether they could remove any prejudicial effect from their minds and follow the court's instructions as to the law. The jury responded affirmatively.
¶ 10. The standard of review for the denial of a mistrial is abuse of discretion. Spann v. State, 771 So.2d 883, 889(¶ 9) (Miss.2000); Knight v. State, 854 So.2d 17, 19(¶ 3) (Miss.Ct.App.2003). The Mississippi Supreme Court has "unequivocally" held that if an objectionable remark *1024 has been made, the trial judge is in the best position to determine the prejudicial effect of the statement. Roundtree v. State, 568 So.2d 1173, 1177 (Miss.1990). The trial court "is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared." Roundtree, 568 So.2d at 1177. In addition, any prejudicial effect may be sufficiently alleviated if the judge instructs the jury to disregard the statement. The "occasions are rare" when the prejudicial effect of a statement requires reversal despite the trial court's admonition to the jury to disregard the improper statement. King v. State, 580 So.2d 1182, 1189 (Miss.1991). "The rule is well established that when an isolated prejudicial question or comment by the prosecution is promptly objected to and the objection is sustained, and particularly when the circuit judge instructs the jury to disregard the incident, there is a presumption the action on the part of the trial court cured the error." Smith v. State, 530 So.2d 155, 161 (Miss.1988).
¶ 11. In the instant case, Burnside immediately objected to the prosecutor's improper remark, and the objection was sustained. Thereafter, the trial judge gave a limiting instruction to the jury that the statement was improper and should be disregarded. Further, the judge questioned the jury to ensure there was no prejudicial effect and received their assurance that they could disregard the statement. These actions on the part of the trial court are presumed to have cured any possible error. See Smith, 530 So.2d at 161. We find no abuse of discretion by the trial court's denying Burnside's motion for mistrial.

II. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN EXCUSING TWO JURORS FOR CAUSE.
¶ 12. Burnside asserts that the circuit court committed reversible error when it excused two jurors for cause at the request of the State. The State was privy to information regarding these two jurors that was not brought out on voir dire. Juror # 7 was dismissed for cause based upon the prosecutor's representation to the court that the juror had been presented before the latest grand jury but not indicted. Juror # 11 was excused based upon the representation that he had a charge of embezzlement pending that would be coming before the grand jury. Burnside objected to their being dismissed for cause when no record was made during voir dire regarding these matters. The prosecutor explained that he had "never gone out before the ... jury panel and discussed what we were doing behind scenes of the grand juries." The trial judge took judicial notice that the prosecutor would have "peculiar unique information" regarding whether persons were under investigation by the grand jury and dismissed the two jurors for cause.
¶ 13. "It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes that the juror could not try the case impartiality." Burt v. State, 493 So.2d 1325, 1327 (Miss.1986). Section 13-5-79 of the Mississippi Code provides that if the court is of the opinion that the prospective juror cannot try the case impartially, "the exclusion shall not be assignable for error." Miss.Code Ann. § 13-5-79 (Rev. 2002). The Mississippi Supreme Court has explained that the defendant "has no right to have specific prospective jurors try his or her case, and ... cannot complain on appeal of a particular exclusion if the end result was a jury composed of fair and impartial jurors." Coverson v. State, 617 So.2d 642, 646 (Miss.1993) (emphasis in original). In Coverson, the court affirmed *1025 the trial court's excusing three jurors for cause on both procedural grounds (by virtue of section 13-5-79) and substantive grounds (by the appellant's failure to prove abuse of the trial judge's discretion). 617 So.2d at 645-46. We find that Burnside's second issue is procedurally barred by section 13-5-79, but nonetheless address his substantive argument which we, too, reject.
¶ 14. Burnside has failed to cite any authority for his proposition that the trial court's acceptance of the representations of the prosecutor as to the two jurors was an abuse of discretion; he claims this to be a matter of first impression. The State argues, by analogy, that this Court has affirmed the trial court's acceptance of representations by the prosecutor, as an officer of the court, during Batson[2] colloquies. See, e.g., Myles v. State, 774 So.2d 486, 489-90 (¶¶ 7-10) (Miss.Ct.App.2000); Farmer v. State, 764 So.2d 448, 454(¶ 15) (Miss.Ct.App.2000). In Farmer, this Court held that the trial judge was "in a better position to adjudge the sincerity of the prosecutor's avowal" and found that the trial court's acceptance of the prosecutor's reason as race-neutral was not clearly erroneous. 764 So.2d at 454(¶ 15). Although the prosecution's recitation of race-neutral reasons on a Batson challenge is not required to rise to the same level of justification as required for a challenge for cause 764 So.2d at 453(¶ 13), we cannot say that the trial judge abused his discretion in relying upon the representations of the prosecutor as to matters which had been or would be presented to the grand jury. As recognized by the trial judge, these matters are uniquely known to the prosecutor.

III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING AN ALLEGEDLY ILLITERATE JUROR TO SIT ON THE JURY.
¶ 15. James Higginbotham was one of the twelve jurors who voted to convict Burnside. Counsel for Burnside later discovered that Higginbotham might be illiterate. The issue of Higginbotham's competency to serve on the jury was raised ore tenus by Burnside at the hearing on his post trial motions. The testimony of Higginbotham is conflicting as to his ability to read. Higginbotham, age 77, testified that he only completed the fifth grade and stated several times that he "can't read." In response to specific questions, however, Higginbotham stated that he can "read some," including the Bible, road signs and "anything in Wal-Mart." He admitted that "[s]omebody in here" had filled out the top of his jury card and that he had signed it. Burnside contends that Higginbotham's inability to read disqualified him from jury service and that the "Court had knowledge of this because the juror testified that someone in the Court filled out his card."
¶ 16. The general rule regarding the jury's composition is that objections not made before the jury is empaneled are waived. Myers v. Mississippi, 565 So.2d 554, 557 (Miss.1990). Further, the statute which requires jurors to be "able to read and write," specifically provides that "[t]he lack of any such qualifications on the part of one or more jurors shall not, however, vitiate an indictment or verdict." Miss. Code Ann. § 13-5-1 (Rev.2002). We find this statute to be controlling. Higginbotham's alleged inability to read cannot vitiate the jury verdict.
¶ 17. As to Burnside's contention that the trial court knew of Higginbotham's illiteracy and actually "assist[ed] *1026 a juror that is not qualified to sit on the jury," we find the argument to be without merit. First, Burnside merely assumes that it was court personnel who assisted Higginbotham in filling out his jury card. Higginbotham testified only that "somebody in here" assisted him; the "somebody" could just as easily have been another member of the venire. Had Burnside wished to advance this argument, he should have questioned Higginbotham further. Second, even if a question of Higginbotham's literacy had come to the court's attention during the jury selection process, any factual dispute as to whether he could read and write would have been resolved by the trial judge. Johnson v. State, 416 So.2d 383, 390 (Miss.1982). The Mississippi Supreme Court has held that a person who "can read and write only a few words is qualified as a juror." Herring v. State, 374 So.2d 784, 788 (Miss.1979). In the instant case, Higginbotham testified that he could read the Bible, road signs and "anything in Wal-Mart." Therefore, even if the trial court had reason to question Higginbotham's literacy, which Burnside has not proved, the evidence would have supported the court's determination that Higginbotham was qualified for jury service. Burnside's contentions are without merit.

IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING AN UNDISCLOSED WITNESS TO TESTIFY AFTER DEFENSE COUNSEL OBJECTED AND REQUESTED A CONTINUANCE.
¶ 18. Burnside objected to the trial testimony of Patsy Savell-Thornton as she was only disclosed as a witness on the morning of trial. He argued that since the burden of proof shifts to the State to prove the defendant's predisposition to commit the offense after the defendant makes a prima facie case of entrapment,[3] Savell-Thornton was not a rebuttal witness but a witness for the State's case-in-chief. Accordingly, Burnside contends that the State violated its discovery obligations,[4] and the trial court should have granted a continuance or prohibited Savell-Thornton's testimony under the "Box Procedures."[5] The trial court rejected this argument, as do we.
¶ 19. It is within the sound discretion of the trial court whether evidence is admitted as rebuttal evidence. Mills v. State, 813 So.2d 688, 691(¶ 11) (Miss.2002). The trial court's decision will only be disturbed upon a showing of abuse of discretion. Mills, 813 So.2d at 691(¶ 11). "Whether the testimony evidence *1027 is properly offered during the case-in-chief or as rebuttal evidence is not always clear. In gray areas, the trial judge must be given due discretion, especially when the defendant is permitted surrebuttal." McGaughy v. State, 742 So.2d 1091, 1094(¶ 14) (Miss.1999). We find no abuse of the trial court's discretion in the instant case. Both the Mississippi Supreme Court and this Court have referred to the evidence offered to overcome an entrapment defense as "rebuttal" evidence.
¶ 20. In Gamble v. State, 543 So.2d 184 (Miss.1989), the defendant made out a prima facie case of entrapment by testifying that the State's informant, McKee, had actually supplied the marijuana which the defendant was accused of selling to an undercover operative of the Mississippi Bureau of Narcotics.[6] The State was unable to shake the defendant's testimony on cross-examination and "failed to put on the informant McKee nor did it produce any other evidence to rebut the undisputed and uncontradicted entrapment defense." Gamble, 543 So.2d at 184-85 (emphasis added). After quoting the shifting burden of proof for entrapment, the Mississippi Supreme Court determined:
"Had the State rebutted the testimony of appellant by calling McKee or by some other credible evidence, the lower court properly would have declined to sustain the motion for directed verdict. However, where the evidence stands uncontradicted, undisputed, and unimpeached, even though the jury may not have believed the appellant, that testimony stands and makes out the defense. In cases such as this, prosecutors must have rebuttal evidence at hand to refute such testimony."

Id. at 185 (emphasis added); see also Pulliam v. State, 592 So.2d 24, 29 (Miss.1991) (reiterating Gamble's admonition that "prosecutors must have rebuttal evidence at hand to refute" entrapment defense). In Tran v. State, 785 So.2d 1112, 1119(¶ 21) (Miss.Ct.App.2001), this Court stated, "In its rebuttal of Tran's claims of entrapment, we find that the State has certainly proven that Tran had a predisposition to commit this crime." (emphasis added). Accordingly, we hold that the trial judge did not err in admitting Thornton's testimony as rebuttal evidence, nor in failing to find a discovery violation in the State's failure to disclose her identity prior to trial.
¶ 21. Any prejudice Burnside claims to have suffered by not knowing the identity of Savell-Thornton prior to trial was inherent in her being a rebuttal witness rather than a witness in chief. One allegation of prejudice, however, deserves separate consideration. Burnside argues that he was prejudiced by Savell-Thornton's testifying because five of the twelve jurors on his case had previously served as jurors in a case where Savell-Thornton was the victim of aggravated assault by her mother-in-law.[7] He claims that if he had known Savell-Thornton would be a witness, he would have questioned the venire *1028 as to whether anyone knew her and would have used his one remaining peremptory challenge to exclude one of the jurors who sat on the assault case in the event the court had not excused them for cause. This assertion is questionable, however, in light of Burnside's failure to ask the venire whether they knew any of the State's witnesses, including the confidential informant, Tiffany Smith. Without any citation of authority, Burnside contends that he was denied a fair and impartial trial by the court's allowing five jurors to sit on both trials;[8] the State did not address this issue.
¶ 22. While the Court finds it troubling that five jurors served on the jury in which Savell-Thornton testified as a victim and then served on the Burnside jury where Savell-Thornton testified as the State's primary rebuttal witness, we do not find reversible error. In Ladner v. State, 148 Miss. 243, 114 So. 341 (1927), the Mississippi Supreme Court recognized:
It might well be that a juror would believe the state's witnesses in one case, and when another case was presented, might have a reasonable doubt of the defendant's guilt on his testimony, or the lack of testimony, or for any number of reasons. The credibility of the state's witnesses was passed upon in a given case and in a given statement of facts. It does not follow that when another and entirely different case is presented a juror or an entire panel is disqualified because they are biased or partial for that reason alone. The facts were necessarily different.
148 Miss. 243, 114 So. at 342 (in absence of showing on voir dire that a juror was biased, the mere fact that some witnesses had testified in jurors' presence as to another crime would not render panel incompetent). Similarly, in U.S. v. Haynes, 398 F.2d 980 (2d Cir.1968), cert. denied 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969), the Second Circuit Court of Appeals stated
We have enough faith in the intellectual capabilities of an average person to believe that a person who has passed upon a government witness's credibility in one set of circumstances and has weighed that witness's testimony against that of one group of defense witnesses will not be influenced by the conclusion he had drawn on that occasion when he weighs the same witness's credibility in the context of different circumstances and in the light of testimony from a different group of defense witnesses. Where some of the witnesses on both sides of the case are not the same in both causes the juror has the opportunity in the later case to gauge anew against a shifted background the testimony and credibility of the witnesses who had testified in the earlier case. While noting that, psychologically speaking, a juror may develop a "set" toward a familiar witness's credibility and toward conviction, even though the witness may not be as reliable in one context as in another, one commentator has noted that the occurrence of such a "set" is not a certainty, and has concluded that the prejudicial influence may not be so strong that any individual juror who has been exposed to it need be disqualified. We agree that there is an opportunity for a juror to be prejudiced when he hears the same witness in two different causes, but "if the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain *1029 jury trial under the conditions of the present day."
398 F.2d at 985-86 (internal citations omitted) (quoting Holt v. U.S., 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910)). In Haynes, the circuit court refused to find as a matter of law that seven of twelve jurors were prejudiced because they had previously sat on a narcotics trial involving some of the same government witnesses. Haynes, 398 F.2d at 986.
¶ 23. In the instant case, Burnside has not shown any prejudice on the part of the five jurors who served at both trials and has failed to cite any authority which would require us to presume prejudice under the present circumstances. To the contrary, our research indicates that prejudice is not presumed. Accordingly, we find Burnside's contention to be without merit.

V. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN STRIKING JURY INSTRUCTION D-7.
¶ 24. The rejected defense instruction read as follows: "If you find from the evidence presented that it is possible, and not proved beyond a reasonable doubt otherwise, that the supplier and buyer where [sic] both working for the state and or sheriff, as a matter of law, you must find Kevin Burnside not guilty." Supply-and-buy scenarios have been condemned by the Mississippi courts numerous times. Pulliam v. State, 592 So.2d 24, 27 (Miss.1991); Gamble v. State, 543 So.2d 184, 185 (Miss.1989). The trial judge refused the proposed instruction in this case, however, because there was no evidence that the State had supplied the drugs which Burnside sold to Smith.
¶ 25. "A defendant is entitled to a jury instruction on his theory of the case." Murphy v. State, 566 So.2d 1201, 1206 (Miss.1990). This rule is limited by the trial judge's power to refuse an instruction that has no foundation in the evidence. Heidel v. State, 587 So.2d 835, 842 (Miss.1991). The supply-and-buy instruction proposed by Burnside had no evidentiary foundation because Burnside put forth no evidence that demonstrated the State supplied the drugs which were sold to Smith. When asked on cross-examination whether the unidentified driver of the Geo Tracker could have been working as an agent of the State, Agent Mays responded, "No, sir, they were not." Burnside offered no evidence to contradict Mays's testimony but argues that the jury could infer that since the driver of the vehicle was not arrested, he was working as an agent of the State.
¶ 26. Burnside relies on Daniels v. State, 569 So.2d 1174 (Miss.1990) to support this position. In Daniels, an undercover agent of the Mississippi Bureau of Narcotics accompanied the defendant to a house at 505 Nathan Street in Columbia, Mississippi, and waited outside while the defendant took the agent's money inside to purchase cocaine. On cross-examination, the agent admitted that the person who lived at that location, Etta Mae Brown, had a reputation for selling drugs. The defendant testified to his unsuccessful attempts to locate Brown and secure her attendance at trial; he added that she had left town for an unknown destination. The jury convicted the defendant, but the Mississippi Supreme Court reversed and remanded for new trial. The supreme court found it troubling that no effort was made by the State to search Brown's residence or to arrest her for selling the drugs at issue. The court held that under the "unusual posture of this case," the State should have been required to offer the testimony of the appropriate representative of the Bureau of Narcotics as to whether Brown was acting as an agent of *1030 the State in the drug transaction. Daniels, 569 So.2d at 1174-77.
¶ 27. We find Daniels distinguishable. First, unlike Daniels, the State put on evidence in the instant case that the third party was not an agent of the State. Agent Mays specifically denied that the person in the white Geo Tracker was working as an agent for the State. Second, in Daniels, the agent was taken to a specific residential address to purchase drugs; the State did not follow up to ascertain the involvement of the known resident of that address. In the instant case, the third party was in a motor vehicle which Agent Mays and Sheriff Waggoner testified they were not at liberty to pursue because of the presence of a confidential informant at the scene. Agent Mays testified that law enforcement attempted to learn the identity of the unknown driver but was unsuccessful. Third, in Daniels, the defendant tried unsuccessfully to secure Brown's presence at trial; in the instant case, Burnside has not alleged that he attempted to secure the driver's presence at trial but was unable to do so. As previously discussed, the burden of making a prima facie case of entrapment is on the defendant. See, e.g., Walls v. State, 672 So.2d 1227, 1230 (Miss.1996). The only evidence in the record clearly states that the unidentified driver of the Geo Tracker was not working for the State, and the reason offered by Agent Mays and Sheriff Waggonner for not following the vehicle to identify the driver was uncontradicted before the jury.[9] Accordingly, we find that Daniels does not support Burnside's argument that instruction D-7 should have been given. The trial court properly refused the supply-and-buy instruction.

VI. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED A MISTRIAL BECAUSE OF THE JURY FOREMAN'S ALLEGED FAILURE TO ANSWER QUESTIONS TRUTHFULLY DURING VOIR DIRE.
¶ 28. Linda Welcher not only served on the jury, but was also jury foreman. Burnside claims that Welcher was not forthcoming in voir dire, and that had she responded truthfully to the questions, Welcher would have been stricken for cause. Alternatively, Burnside alleges he would have used his last peremptory strike to exclude Welcher from the jury. In Odom v. State, 355 So.2d 1381 (Miss.1978), the Mississippi Supreme Court held that when a prospective juror in a criminal case has substantial knowledge of the information sought to be elicited by a relevant, unambiguous question on voir dire but fails to respond, the trial court should determine if prejudice to the defendant could be reasonably inferred from the juror's failure to respond. Odom, 355 So.2d at *1031 1382. If prejudice could be so inferred, the court should order a new trial. Whether a jury is fair and impartial is, however, a judicial question, and "the court's judgment will not be disturbed unless it appears clearly that it is wrong." Id. at 1382-83.
¶ 29. There were four areas of inquiry to which Burnside claims Welcher failed to respond truthfully on voir dire, three of which are interrelated.[10] First, Burnside claims Welcher failed to respond when asked if she knew the defendant. The panel was only asked to respond by raising their hands. The showing of hands was not recorded by the court reporter. The trial judge later commented, however, that "a whole host raised their hands and I expected that because the Burnsides are well known people." Welcher testified in the post trial hearing that she raised her hand in response to this question, thereby acknowledging that she knew Burnside. By her silence to the follow up question, Welcher confirmed that her knowing him would not affect her impartiality as a juror. Second, the court asked the panel whether any of them knew when they came into court that there was a possibility that they would sit on "State versus Burnside." The record reflects that the "panel respond[ed] affirmatively." In response to the court's follow-up questioning as to whether the case had been discussed in their presence since they arrived at the court, Welcher remained silent. Third, Burnside contends that the panel was asked whether any of them had a "business relationship" with Burnside. In fact, the questions regarding "business relationship[s]" with Burnside were not addressed to the entire panel but to individuals who had responded affirmatively that their knowledge of Burnside or his family might affect their impartiality.
¶ 30. Welcher testified at the hearing on Burnside's post-trial motions that she knew Burnside "[j]ust by the name," had never seen him with her half-sister, Rhonda Gilmer, did not recall his being in Gilmer's wedding, and had not even spoken with Gilmer in the four years since their father's death. Welcher further testified that she knew her sister, Judy Pigg, to be a co-worker with Burnside's sister, Theresa McRaney, but was unaware how well they knew one another. Welcher testified that, "Probably the most that I've ever had to do with Kevin was selling him prepaid minutes at my phone booth" four years previously.[11]
¶ 31. Burnside's attempted impeachment of Welcher brought out the facts that both Welcher and Burnside had been in Gilmer's wedding and that Pigg and McRaney were close friends prior to the trial. McRaney testified that Pigg commented to her that Welcher "was not going to be on the jury ... that my brother used to date her sister [apparently, Gilmer], and she was going to have to tell *1032 them that, and she was not going to sit on the jury." Pigg denied the comment, testifying that Welcher had "hoped not to" sit on Burnside's jury because of Pigg's friendship with McRaney. Burnside claims that Welcher's having told her sister that she hoped she would not have to sit on his jury proved that she had previously heard of the case before trial and failed to reveal her knowledge on voir dire. The record reflects, however, that when asked whether anyone was aware of the possibility of serving on this specific case, the "panel respond[ed] affirmatively." In response to the court's follow-up questioning as to whether the case had been discussed in their presence since they arrived at the court, Welcher remained silent. Burnside has offered no evidence that Welcher should have responded to the court's follow-up questioning.
¶ 32. Burnside further claims that Welcher is guilty of misconduct for discussing the case with her sister, Judy Pigg, in violation of the trial court's instruction not to discuss the case prior to the hearing on post-trial motions. We agree with Burnside that Pigg's testimony regarding this incident evidences misconduct, but not by Welcher. Pigg testified that after Welcher had been called to jury duty, Burnside's sister, Theresa McRaney, telephoned Pigg, stating "[t]hat they were in hopes that my sister would sit on the jury and that she would plead innocent for Kevin because they needed a complete majority, and if he had one innocent, he would be set free." Thereafter, McRaney contacted Pigg two times during the trial, asking Pigg to "tell my sister Linda that her mother ... asked that my sister do her a favor and plead innocent for her son." Pigg took the comment that her "sister might need help one day with her son," as a threat. Pigg did not, however, relay these messages to Welcher during trial but told her that she wanted to talk to her "when everything was over with."[12]
¶ 33. The trial court overruled Burnside's motion for new trial. As far as Welcher's knowing Kevin Burnside, the court quoted Judy Pigg, "Who doesn't know Kevin." As to Burnside's allegation that Welcher had predetermined that she wanted to be on the jury to vote guilty, the court credited Pigg's testimony that Welcher never said that she was going to sit on the jury but hoped that she would not. As to Pigg's testimony regarding her telephone calls from McRaney, the court found that her "testimony seemed to open a new door as far as substantiating the purity of the jury verdict." We agree. The record reflects that "a whole host raised their hands" when asked whether they knew Burnside. Welcher testified that she was among those who raised their hands in response to this question, and there is nothing in the record other than the argument of counsel to dispute her testimony. By her silence to the court's follow-up question, Welcher confirmed that her knowing Burnside would not affect her impartiality as a juror. The testimony of Judy Pigg evidences that Burnside's sister sought to influence Welcher to "plead innocent" for Burnside; Welcher's veracity was challenged only when she, in fact, remained impartial. The trial court's conclusion as to the "purity of the jury verdict," will not be disturbed on appeal.
¶ 34. THE JUDGMENT OF THE LEAKE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I SALE OF METHAMPHETAMINE AND SENTENCE OF TEN YEARS WITH FIVE *1033 YEARS SUSPENDED AND FIVE YEARS OF PROBATION, AND COUNT II SALE OF METHAMPHETAMINE AND SENTENCE OF TEN YEARS WITH SENTENCE IN COUNT I TO RUN CONSECUTIVELY TO SENTENCE IN COUNT II, LEAVING FIFTEEN YEARS TO SERVE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] Prior to trial, Tiffany Smith married; witnesses referred to her as both "Smith" and "Bozeman." For the sake of simplicity, we will refer to her as "Smith."
[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[3] See, e.g., Walls v. State, 672 So.2d 1227, 1230 (Miss.1996) ("Once the defendant makes out a prima facie case that he was entrapped, three consequences follow: First, the burden of production and proof shifts to the prosecution. Second, predisposition becomes a fact of consequence and evidence thereof becomes relevant and, hence, always admissible. Third, the accused becomes entitled to have the defense of entrapment submitted to the jury on proper instructions").
[4] See Uniform Circuit and County Court Rule 9.04 A. 1. (requiring disclosure of "all witnesses in chief proposed to be offered by the prosecution at trial"). The State, however, "has no duty to provide the defense with the names of possible rebuttal witnesses, unless the State has requested notice of alibi defense." Smith v. State, 724 So.2d 280, 320 (¶ 162) (Miss.1998).
[5] Rule 9.04 I. of the Uniform Circuit and County Court Rules governs a trial court's response to "the prosecution attempt ... to introduce evidence which has not been timely disclosed to the defense." The rule is a codification of Justice Robertson's special concurrence in Box v. State, 437 So.2d 19 (Miss.1983). See Dycus v. State, 875 So.2d 140, 159(n.8) (Miss.2004).
[6] There are two types of entrapment situations: the first being that the defendant was induced to do something he would not otherwise be "predisposed" to do; the second being that the State's offensive conduct prescribes a finding of entrapment as a matter of law, despite the defendant's predisposition to commit the crime; this second situation "exists when the State both supplies and buys the illegal drugs." Robert v. State, 756 So.2d 806, 808-09 (¶¶ 10-12) (Miss.Ct.App.1999). The defendant's entrapment defense in Gamble was based upon the second situation.
[7] The jury convicted Savell-Thornton's mother-in-law, and this Court affirmed that conviction. See Thornton v. State, 905 So.2d 745 (Miss.Ct.App.2004). It should be noted that the prosecutor and judge were different for both trials.
[8] Failure to cite any authority may be treated as a procedural bar, and we are under no obligation to consider the assignment. See, e.g., McClain v. State, 625 So.2d 774, 781 (Miss.1993).
[9] Burnside testified that Brent White was the driver of the Geo Tracker. At the hearing on his post-trial motions (which raised other issues), Burnside proffered an arrest warrant that Sheriff Waggoner had previously served on Brent White for possession of precursors with intent to manufacture and evidence that White had not been indicted on the charge. He argues on appeal that there was a jury issue as to whether the sheriff knew the identity of the driver of the Geo Tracker, and had asked White to work for him since the sheriff had testified that he gives "all people who are arrested on drug charges" the opportunity to help with the drug problem in Leake County. The obvious problem with this argument is, of course, that the evidence of Sheriff Waggoner's prior arrest of White was not presented for the jury's consideration but only raised ore tenus following his post trial motions. Had Burnside wished to impeach Sheriff Waggoner with his prior arrest of Brent White, he should have raised the issue at trial. Having failed to do so, he cannot rely on the information he believes would have been elicited to support a jury instruction which was refused for lack of evidentiary support.
[10] The fourth is simply without merit. Burnside contends that the panel was asked whether anyone "worked for law enforcement" and argues that Welcher improperly concealed her employment as a secretary at the Walnut Grove Correctional Institute. The question actually asked on voir dire, however, was whether anyone had ever "worked for the MBN or works for the Leake County Sheriff's Department." Welcher's employment at the correctional institute did not call for her to respond to this question.
[11] This is the "business relationship" Burnside claims Welcher failed to reveal on voir dire. Even if the entire panel had been asked whether any of them had a "business relationship" with Burnside, which they were not, we do not see that Welcher's failure to disclose this transaction would have been a misrepresentation to the court. The term "business relationship" connotes a course of dealings between the parties and not just an isolated incident such as selling telephone minutes from a booth years previously.
[12] The subsequent discussion between Welcher and Pigg apparently took place immediately after trial, and, therefore, would have been prior to the trial court's instruction for jurors not to discuss the case with anyone before the hearing on post-trial motions.