# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01286-SCT

*JOSEPH PATTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/19/2016 |
| TRIAL JUDGE: | HON. M. JAMES CHANEY, JR. |
| TRIAL COURT ATTORNEYS: | JERRY CAMPBELL |
| | DANIEL PAUL EDNEY, II |
| | RICHARD EARL SMITH, JR. |
| | MARCIE TANNER SOUTHERLAND |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Joseph Patton was convicted of murder following a jury trial in the Warren County Circuit Court. Patton appeals his conviction, claiming his trial was rendered fundamentally unfair by the trial court's refusal to strike for cause two prospective jurors from the jury venire who said during voir dire examination they knew the decedent's son. Finding no merit in Patton's claim, we affirm Patton's conviction.

## FACTS

¶2.     In September 2015, Patton was living with his sixty-three-year-old uncle, Alfred Patton, in a mobile home in Warren County.  On Tuesday, September 22, 2015, Alfred's next-door neighbor, William Thigpen, went to Alfred's trailer to check on him, having not seen Alfred in several days.  Thigpen discovered Alfred's body inside the mobile home with an ax lodged in the throat.  The body appeared to have been dead for several days.

¶3.     Thigpen last saw Alfred alive on Friday, September 18.  The Thursday night before, he and Alfred had watched a televised football game together at Alfred's trailer, and Patton also was present.  Thigpen said Alfred had expressed to him on several occasions that Alfred did not like the circumstances of Patton living there.

¶4.     Thigpen's live-in fiancé, Gabrielle Phillips, testified that Patton and Alfred had conflicts and that Alfred wanted Patton to move out.  She recalled an argument Patton and Alfred had on Thursday, September 17, during which Alfred asked Patton to leave.  Phillips said she heard Patton tell Alfred, "You keep on and one of these days you're going to regret it."  Phillips said she last saw Alfred alive on Friday, September 18.

¶5.     Phillips saw Patton on Saturday, September 19, and Patton spoke to her before going inside Alfred's trailer.  He did not stay there long.  She saw Patton again on Monday, September 21, between 4:00 and 4:30 p.m.  They spoke to each other before Patton went inside Alfred's trailer.  Phillips saw Patton come out of Alfred's trailer carrying a basket which Patton put in his car.

¶6. Warren County Sheriff's Investigator Chris Satcher described the ax which killed Alfred as a 26-inch Estwing brand camping ax. Investigators found a matching head cover for the ax in the trash outside Alfred's trailer. Investigators learned that a local Home Depot sells this brand of ax and obtained an in-store video from the store which showed Patton purchasing this type of ax on Wednesday, September 16, 2015. Investigators also obtained a receipt from the transaction, which showed a debit card was used to purchase the item.

¶7. Meanwhile, at the scene of the homicide, investigators observed and photographed a Cobra beer bottle on the floor inside the trailer, along with a Seagram's gin bottle. Satcher said the gin appeared to contain a cloudy foreign substance, which experts later determined was diphenhydramine, an active ingredient in Benadryl and other over-the-counter sleep aids.

¶8. Satcher also inspected and gathered a pair of athletic shorts from one of the trailer's bedrooms. Inside the shorts, Satcher found a folded envelope containing a grainy white powder similar to a crushed pill, which experts determined contained diphenhydramine.

¶9. Also found in the shorts was a debit card; a Nationwide life insurance proposal for a sixty-three-year-old male with a $25,000 death benefit; a document addressed to Patton referencing the last four digits of Patton's social security number; and a receipt from a convenience store in Vicksburg, Mississippi. The receipt was for gasoline and one King Cobra 32-ounce beer, and was dated September 18, 2015. The transaction was made with the debit card found in the shorts, which matched the debit card number used to purchase the ax.

¶10.    On the front deck of Alfred's home, Satcher recovered a few folded towels, garbage bags, and a gallon container of household bleach.  From these items, Satcher recovered a receipt from a Family Dollar store dated September 18, 2015, with a time stamp of 3:36 p.m. Investigators also obtained a video from the Family Dollar store showing Patton purchasing the bleach.

¶11.    When Patton developed as a person of interest on September 22, a BOLO ("be on the lookout") was issued.  That same day, Vicksburg police spotted Patton's vehicle parked on Washington Street.  As authorities approached the vehicle, Patton appeared, and he was arrested.  Patton initially gave authorities Alfred's address as his residence, but in a subsequent interview, Patton claimed his address was 3133 Washington Street, the location where authorities found Patton's vehicle  parked.

¶12.    After obtaining a search warrant for Patton's vehicle, authorities found a small spiral notebook inside the vehicle.  Written inside the notebook was a "to-do list" which included a list of items: "Clorox, garbage bags, Benadryl, blankets, and towels."  Also found in Patton's vehicle was a term life-insurance policy death-benefit quote from Nationwide Insurance for a sixty-three-year-old male.

¶13.    Investigators thereafter contacted several insurance companies and subpoenaed information about a term life policy issued by MetLife in the amount of $20,000 on the life of Alfred Patton.  The policy was issued September 16, 2015, to Joseph Patton as the beneficiary. The subpoena production included MetLife's recorded telephone conversations with the party who had purchased the policy and showed the initial premium was paid with

4

the same debit card found in the shorts recovered from Alfred's home. Also produced were records sent to an email address, purportedly Patton's.

¶14. When Patton was arrested on September 22, authorities seized a cell phone in his possession. Investigators obtained a search warrant for the phone's records and data. Investigators found a text message dated September 16 from MetLife thanking the recipient for signing up for texts.

¶15. At trial, Patton testified he moved in with Alfred after moving back from Texas, and that he paid Alfred $75 a week in rent. He said he did not have a bedroom in Alfred's trailer and slept on the couch. Patton said he got along with Alfred. But when Alfred drank, Alfred wanted to be left alone and would ask Patton to leave, which is what occurred on Thursday, September 17. Patton said there was no argument and he complied with Alfred's request, leaving before the end of the football game they were watching to go stay with a friend in Vicksburg. Patton denied ever going back to Alfred's house after Thursday night.

¶16. Patton denied killing Alfred. He said the athletic shorts belonged to Alfred and were found in one of the rooms in which Alfred slept. Patton said he did not know whose debit card was found in the shorts, but he had a debit card and Alfred had another. Patton said he and Alfred shared a third debit card, which according to Patton was the card used to buy the ax.

¶17. Patton said his papers were in Alfred's shorts because Alfred always got the mail. And regarding the powder found in the shorts and the substance in the gin, Patton said Alfred often took something to help him sleep.

5

¶18. Patton admitted buying the bleach, which he used for cleaning the home and doing the laundry. Patton also admitted to buying the ax because Alfred had asked him to chop down a tree in the yard to cover a week's rent.

¶19. Patton claimed the notebook found in his vehicle belonged to Alfred, who frequently used Patton's vehicle. Patton said he did not know whose handwriting was in the notebook, but it was not his (Patton's).

¶20. Patton also said that he never applied for any life insurance, and he did not know whose voice was on the phone recordings obtained from MetLife, but it was not his. Patton also told the jury that he often let Alfred use his email address, which he and Alfred shared. Patton admitted the cell phone found in his possession was his, but Alfred used the phone also because he did not have a home phone.

¶21. Patton was found guilty of murder. He appeals his murder conviction, claiming one assignment of error: his trial was rendered unfair by the trial court's denial of a request to strike for cause two prospective jurors who each said they knew Alfred's son.

¶22. Additional facts will be related as necessary in our discussion of Patton's claim.

### DISCUSSION

**Whether Patton's trial was rendered unfair by trial court's refusal to strike for cause two prospective jurors who said during voir dire examination they knew the decedent's son.**

¶23. The record shows that, during voir dire, when asked by defense counsel whether anyone knew certain members of the Patton family, potential jurors Cedric Wyatt, juror

6

number 153, and a Mr. Carter, juror number 139, both advised they knew the decedent's son, Alfred Jr.

¶24. Wyatt said he used to work with Alfred Jr., and Wyatt's brother was friends with Alfred Jr. Defense counsel asked Wyatt, "Would you have a problem – would it cause you some problem to sit here?" Wyatt answered, "No."

¶25. Carter said, "Yeah, I worked with Alfred [Jr]." Defense counsel commented, "Well, you're going to have to face him at work again, correct, when you go back to work?" Carter indicated affirmatively. Defense counsel then asked, "Would it cause you some problems, how you voted in this case, if you saw him again?" Carter replied, "You'd have to ask him that." Defense counsel said, "No. I mean cause you problems." Carter replied, "No."

¶26. After voir dire examination, defense counsel requested that Wyatt and Carter be removed for cause. The trial court denied both requests. Carter thereafter was struck with the defense's last peremptory challenge, and Wyatt ended up on the jury after the defense had exhausted its peremptory challenges.

¶27. We point out that the record shows there was some confusion on Patton's part during jury selection. According to the record, Patton participated in the selection process with his attorney assisting. After the State tendered twelve jurors, Patton struck the first eight chosen by the State, at which point Patton's attorney said, "You don't get but 12." Patton indicated that he did not understand. The trial court then explained to Patton how the process worked.

¶28.    Afterward, Patton elected to accept the last juror he had previously struck with his eighth peremptory challenge, and the trial court allowed Patton to do so. The selection process continued, and Patton used his last peremptory challenge to strike Carter.

¶29.    Patton contends on appeal that there was an implied prejudice in this instance which the trial court should have recognized and acted upon, striking both potential jurors for cause. Citing *Scott v. Ball*, 595 So. 2d 848 (Miss. 1992), and other cases, Patton submits this Court has indicated that not only is implied prejudice present in cases where a close relationship between jurors and parties or witnesses, but there is a presumption of impaired impartiality also is present in such instances. Patton thus contends it was error for the trial court to refuse the challenges for cause as to Wyatt and Carter because of the presumption of prejudice and other factors. Accordingly, Patton requests a new trial.

¶30.    We disagree. "[U]nder Mississippi law, any person not disqualified under Mississippi Code Annotated Section 13-5-1, who will make oath that he or she is impartial, is competent to sit as a juror in a criminal case." *Archer v. State*, 986 So. 2d 951, 958 (Miss. 2008) (citing Miss. Code Ann. § 13-5-79 (Rev. 2002)). "The trial judge whose duty is to see that a competent, fair, and impartial jury is empaneled, is empowered with broad discretion to determine whether a prospective juror can be fair and impartial–notwithstanding the juror's admission under oath that he or she will be." *Id*. at 958-59. This Court has held that "a juror who may be removed on challenge for cause is one against whom a cause for challenge exists that would likely [a]ffect his competency or impartiality at trial." *Evans v. State*, 725 So. 2d 613, 653 (Miss. 1997). Whether a potential juror can be fair and impartial is a judicial

8

question reserved for the trial judge and will not be disturbed unless clearly wrong. *Archer*, 986 So. 2d at 957 (citing *Dennis v. State*, 555 So. 2d 679, 682 (Miss. 1989); *Walls v. State*, 371 So. 2d 411, 413 (Miss. 1979)). "No general rule can be stated which would control every conceivable situation with respect to a juror's qualifications[; e]ach case must be decided on its own merits in light of the facts before the court." *Walls*, 371 So. 2d at 413 (citing *Odom v. State*, 355 So. 2d 1381 (Miss. 1978)). We also reiterate this Court's rule "that no reversible error results when the trial court fails to sustain a challenge for cause, and the juror(s) at issue is ultimately excused with a peremptory challenge." *Sewell v. State*, 721 So. 2d 129, 135 (Miss. 1998).

¶31. At the outset, we note the case *Bell v. State*, 725 So. 2d 836 (Miss. 1998). There, the defendant, convicted of capital murder, claimed the trial court had erred in denying his challenges for cause as to five jurors because of their relationships to the victim or to law enforcement. *Id*. at 845. The first potential juror's husband was a retired police officer, and the juror had worked with the victim's mother for about six months. *Id*. The second potential juror's father had been a deputy sheriff. *Id*. The third potential juror had a business relationship with the victim's father, and while doing business with the father–who knew the juror had been selected to be on the panel–was told by the father he was glad he (third potential juror) had been selected, because "we need good jurors." *Id*. The fourth potential juror's wife knew the victim's mother through work and also went to church with the victim. *Id*. The juror also had sent a card to the victim's family after the victim's death. *Id*. The

fifth potential juror owned an auto-parts business where the victim's father had done some business over the years, and had hunted with the father occasionally. *Id*. at 845-46.

¶32.    The trial court in *Bell* declined to excuse any of the five potential jurors for cause, and the defendant used five of his allotted twelve peremptory challenges to strike them. The defendant claimed on appeal the trial court's decision essentially deprived him of the full twelve peremptory challenges allowed because it compelled the defendant to use five of the twelve on those who should have been excused for cause. The *Bell* Court rejected this claim.

¶33.    *Bell* first reiterated the wide discretion a trial judge has in determining whether to excuse prospective jurors for cause. Next, in finding the trial court did not abuse its discretion, *Bell* noted *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1990), *superseded by statute on other grounds, see Bevill v. State*, 556 So. 2d 699, 713 (Miss. 1990). In *Mhoon*, this Court reversed a defendant's capital murder conviction where twelve members of a thirty-nine member jury pool either were policemen or were related by blood or marriage to current or former members of law enforcement; also, a uniformed policeman served as foreman of the jury. *Mhoon* found that a "statistical aberration" had occurred with the jury pool, and the "unique factual situation" of the "unusual case" before it manifested "too great a risk" of potential "undue influence over the opinions of other jurors . . . ." *Bell* pointed out that, while *Mhoon* had found a significant problem with the jury pool which necessitated reversal of the defendant's conviction, the *Mhoon* Court also stated, "there is no reason why an officer or an officer's relative should not serve on a jury if otherwise qualified to follow the law and the evidence." *Bell*, 725 So. 2d at 846 (quoting *Mhoon*, 464 So. 2d at 81).

¶34. The **Bell** Court, addressing those potential jurors who had "disclosed acquaintances and business relationships with relatives of the deceased[,]" found that each one had "declared, under oath, that their relationships would not prevent them from following the court's instructions and applying it fairly to the facts of the case." **Id**. **Bell** added:

> While the judge's voir dire may not have probed as deeply as Bell thinks the questions should have into these jurors' ability to try the case fairly, Bell, of course, had the opportunity to pursue any questions through his attorney's examination of the jurors. He did not choose to do so.

**Id**. **Bell** said, "Mere acquaintance or even family relationships with parties or those related to parties is not sufficient to require that a juror be excused for cause." *See id*. (citing **Rush v. State**, 278 So. 2d 456 (Miss. 1973) (in which this Court found no error in the trial court's decision not to excuse for cause a prospective juror who knew the defendant and had obtained a money judgment against him, when the prospective juror stated he could put the relationship out of his mind and try the case on the facts and the law)).

¶35. We find that to be the case here. The relationship(s) and/or association(s) disclosed by Wyatt and Carter with the victim's son were not–on this record–enough to say the trial court should have excused either prospective juror for cause. The record does not tell us what type of working or employment relationship either prospective juror had (previously or presently)[1] with the son, as there was no further inquiry into either matter beyond that related above. But any fault with this omission, as **Bell** instructs, does not lie with the trial

---

[1] It is not clear from the record whether Wyatt or Carter currently were working with the victim's son at the time of trial. Based on their initial responses, both prospective jurors seemed to say they had worked with victim's son in the past. Although, when asked by defense counsel about having to face the son when Carter returned to work, Carter indicated that would be the case.

11

court. The record clearly illustrates that the defense could have examined these relationships further if it had chosen to do so. *See, e.g.*, *id*. at 846.

¶36. Further, *Scott* and the other cases Patton relies upon on appeal are distinguishable. In *Scott*, this Court reversed for a new trial a medical-malpractice judgment in favor of a doctor after finding that *Batson*[2] violations had occurred with the jury selection process. *Scott*, 595 So. 2d 848. While *Scott* also found error in the trial court's failure to exclude a potential juror whose family had been treated occasionally by the doctor over a period of ten years, *Scott* did not find this error constituted reversible error, noting at the outset of the opinion that only "the [*Batson*] issue requires reversal." *Id.* at 849.

¶37. In addressing the challenge for cause issue, *Scott* said:

> To the extent that any juror, because of his relationship to one of the parties, his occupation, his past experience, or whatever, would normally lean in favor of one of the parties, or be biased against the other, or one's claim or the other's defense in the lawsuit, to this extent, of course, his ability to be fair and impartial is impaired.

*Id*. *Scott*, however, coupled this statement with the following:

> It should also be borne in mind that jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference. ***Harding v. Estate of Harding***, 185 So. 2d 452, 456 (Miss. 1966); ***Howell v. State***, 107 Miss. 568, 573, 65 So. 641, 642 (1914).

595 So. 2d. at 849.

---

[2] *See **Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed.2d 69 (1986) (holding that the Equal Protection Clause forbids the government from exercising peremptory challenges to exclude jurors on account of their race); and ***Edmonson v. Leesville Concrete Co.***, 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed.2d 69 (1986) (holding that ***Batson*** principles apply to civil cases between private litigants).

¶38.    ***Scott*** cautioned that in cases in which a physician is a party, the trial court "must be sensitive to the qualification of a juror" who has been treated by him or her, "or whose family members have at one time or another been patients" of his or hers, especially in smaller towns and less populated areas. ***Id***. ***Scott*** explained, "Mississippians in less populated areas enjoy a close, fraternal relationship with their doctors, and regardless of a prospective juror's complete sincerity in his belief of his ability to be fair, it is only human nature that in most cases he will be more reluctant to return a verdict against the physician." ***Id.*** at 851.

¶39.    We do not find the same type of intimate or personal relationship here.

¶40.    In ***Taylor v. State***, 656 So. 2d 104 (Miss. 1995), upon which Patton also relies, this Court held the trial court erred in refusing to remove for cause the brother of an assistant district attorney who worked in the office of the district attorney prosecuting the case against the defendant. The brother was selected as a juror in the case after the defendant already had exercised all of the peremptory challenges allotted. Finding the issue as one of first impression, the ***Taylor*** Court cited as persuasive authority ***People v. Macrander***, 828 P.2d 234, 242 (Colo. 1992), which states:

> [A] prospective juror who is related within the third degree by blood, adoption, or marriage to a deputy district attorney presently serving on the staff of the elected district attorney responsible for the criminal prosecution is related to an "attorney of record" for purposes of a challenge for cause. . . .

***Id***. at 110. ***Taylor*** reiterated that, "[o]ne of the purposes of challenges, for cause and peremptory, is to eliminate jurors who have expressed or implied prejudices, or who may be put in an embarrassing position despite protestations to the contrary." ***Id***. ***Taylor*** said, "[c]ertainly, a juror who is the brother of an assistant district attorney is in such a position[,]"

13

and that "he is close to his sister and is her neighbor makes the problem more acute." *Id.* at 111. Accordingly, this Court held that the trial court in *Taylor* erred in not excusing that particular juror for cause.

¶41. But as with *Scott*, the type of relationship found in *Taylor* is not found here.

¶42. Lastly, Patton cites *Poe v. State*, 739 So. 2d 405, 409 (Miss. Ct. App. 1999), in which the defendant had claimed on appeal that the trial court's decision to exclude certain veniremen had a "*Batson*-like effect." Rejecting the claim, the Court of Appeals first pointed out that *Batson* claims involve peremptory challenges, not excusals for cause. *Id.* at 409. The Court of Appeals next found no abuse of discretion in the trial court's decision to remove for cause a potential juror who went to school with the defendant, was friends with the defendant's brother, and whose best friend had dated the defendant. *Id*. *Poe* also found no abuse of discretion in the trial court's decision to remove a potential juror whose son was a first cousin to the defendant. *Id*.

¶43. That *Poe* found no abuse of discretion in the trial court's decision(s), simply goes to the Court of Appeals' limited standard of review with regard to such matters. *See again*, *Walls*, 371 So. 2d at 413 ("No general rule can be stated which would control every conceivable situation with respect to a juror's qualifications[; e]ach case must be decided on its own merits in light of the facts before the court.").

¶44. For our purposes here, there was no showing that either prospective juror had a close personal relationship with the victim's son, just that they had worked together, and that Wyatt's brother was friends with the son. Consistent with *Bell*, and not inconsistent with

14

either *Scott*, *Taylor*, or *Poe*, the relationships disclosed here are, by themselves, insufficient to disturb the trial court's judgment that both prospective jurors on their oaths could be impartial in Patton's trial.

¶45.   For these reasons, Patton's claim that the trial court erred by failing to strike Carter and Wyatt for cause, is without merit.

## CONCLUSION

¶46.   We affirm Patton's conviction and sentence for murder.

¶47.   **AFFIRMED.**

**RANDOLPH, P.J., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR.  KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KING, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶48.   I respectfully dissent. I would find that the trial court abused its discretion by denying Patton's request to strike prospective jurors Wyatt and Carter for cause.[3] Patton was on trial for the brutal ax murder of his uncle, and it is manifest from the *voir dire* examination, in which numerous venire members expressed knowledge of the facts of the case or had some connection to persons involved, that the crime was notorious and news of it had spread throughout the county. Carter, on whom the defense exercised a peremptory strike, said that he had worked with the murder victim's son and would have to face him when he returned

---

[3] One cannot complain on appeal of the failure to excuse a juror for cause unless the appellant exhausted all his peremptory challenges. *Billiot v. State*, 454 So. 2d 445, 457 (Miss. 1984). The defense did use a peremptory strike on Carter. But because the majority addresses the trial court's exercise of discretion regarding both Wyatt and Carter, I do likewise. Although the error regarding Carter is not reversible because he was excused, Wyatt served on the jury and the trial court reversibly erred by failing to strike him.

to work.[4] Wyatt, who was selected for the jury because the defense had exhausted its peremptory strikes, said that he previously had worked with the victim's son, and also that his brother and the son were friends. While both Carter and Wyatt said that they would have no problem serving, neither expressly said that he could be fair and impartial.

¶49.    The defendant's right to a trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution. U.S. Const. amend. VI; Miss. Const. Art. 3, § 26. The circuit court has considerable discretion in determining whether to strike a juror for cause. *Scott v. Ball*, 595 So. 2d 848, 849 (Miss. 1992). Nonetheless, "[t]he circuit judge has an absolute duty . . . to see that the jury selected to try any case is fair, impartial and competent." *Id.* at 850. To that end, the circuit judge must "scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." *Id.*

¶50.    We have recognized that a juror's ability to be impartial may be impaired to the extent that the juror's relationship to a party, bias against a party, occupation, past experience, or other factors would cause him to lean in favor of one party or the other. *Id.* When a venire person assures the court that, despite such circumstances, he or she can be fair and impartial, the court may give that assurance significant deference. *Id.* Nonetheless, despite a potential juror's promise under oath that he or she can be impartial, the trial court is fully vested with discretion to excuse the potential juror if the court believes he or she could not try the case impartially. *Coverson v. State*, 617 So. 2d 642, 646 (Miss. 1993).

---

[4] As noted by the majority, the record is ambiguous on whether Carter was working with the victim's son at the time of the trial or had worked with him in the past.

16

¶51. I would find that the trial court abused its discretion by failing to excuse Wyatt and Carter for cause. Both of these potential jurors communicated that they worked or had worked with the victim's son, and Wyatt also said that his brother and the son were friends. Thus, it was reasonable for the defense to challenge them for cause on the basis of their relationships with the victim's son. Because it is readily conceivable that coworkers would afford each other some degree of loyalty, a potential for bias against Patton certainly existed.[5] Regarding Wyatt, that potential was compounded by the fact that his brother was a friend of the victim's son. This Court has recognized that, when a reasonable challenge is made and other jurors against whom no challenge is made are available, the trial court's discretion to deny the challenge is "considerably narrowed." *Scott*, 595 So. 2d at 850. Further, neither of the potential jurors expressly said that he could be fair and impartial; rather, each merely said that serving would not be a problem. *See Billiott v. State*, 454 So. 2d 445, 457 (Miss. 1984) (a juror's promise to "try" to follow the court's instruction was insufficient). Because the defense's for-cause challenges were manifestly reasonable, other potential jurors against whom no challenge had been made were available, and the challenged jurors never said they could be fair and impartial, I would find that the trial court abused its discretion by denying his for-cause challenges to them. And because Wyatt served on the jury, I would reverse and remand for a new trial. The risk of this juror's being less than impartial in this particular case, either consciously or subconsciously, was obvious, and it easily could have been avoided.

---

[5] In *Flowers v. State*, 2017 WL 5076152 at *31 (Miss. November 2, 2017), a majority of this Court recognized the danger of co-worker bias, finding that a venire person's working with a member of the defendant's family was a race-neutral reason for exercising a peremptory strike.

17

**WALLER, C.J., AND KING, J., JOIN THIS OPINION.**