I. INTRODUCTION
In this burglary and attempted sexual-assault case, the defendant, Dwight Coverson, broke into Curtescine Lloyd's home in Edwards, Mississippi, on the night of February 3, 1990. Coverson burglarized Lloyd's home and then attempted — but failed — to sexually assault her. A subsequent investigation by the Hinds County Sheriff's Department led to Coverson's arrest. *Page 643 
A jury in the Hinds County Circuit Court found Coverson guilty, for which the trial judge sentenced him to a total of 25 years' imprisonment.
 A. Detailed Facts[1]
The victim in this case provided a factual account of the events:
 Okay, I heard this noise [around midnight on February 3]. It didn't seem to be a loud noise. I'm a real light sleeper, so I woke up. I didn't think anything about it because my aunt lived with me and I thought maybe she had got sick during the night because she does get sick sometimes. So I turned over in bed. I always leave a night light burning in my bathroom. My bathroom is exactly across the hall from my bedroom. And I turned over in bed so I could be facing the door so when she walks up, you know, to tell me she was sick I'd see her.
 I heard another noise, and this noise was closer to my bedroom, as if someone had walked into a chair. And I just laid there waiting for her to come. While I was watching, here appeared this man standing in my bedroom door, with a cap turned backwards on his head and both fists balled up and his shoulders slumped over like that. And I laid there and I squinched my eyes to make sure I was awake, and he was standing there trying to focus on me.
 I sat straight up in bed, and I said, "Oh, my God! Oh, my God!" And he ran over to the bed as fast as he could and shoved me with his hand open in my chest, and shoved me back in bed. He said, "Bitch, you'd better not turn on a light." I had a night-lamp on my nightstand. . . . He said, "Bitch, you'd better not turn on a light." I said, "Okay, okay, please, don't kill me; don't kill me. What do you want? Please, don't kill me." And I was pleading with him. He stood there for a minute, right close beside my bed. He said, "Bitch, if you holler, you're dead. You'd better not breathe loud." And I was saying, "Okay, okay, please, don't kill me. What do you want? Please don't kill me."
 He says, "Wait a minute." He said, "First, I'm gonna get me some of this. I don't know, I might kill you." He said, "But first I'm gonna get me some of this." And I said "Oh, my God!" He said, "Bitch, what did you say?" I said, "Nothing, nothing." And he said, "Okay, I'm going to take my clothes off." He said, "You listen. I'm going to take my clothes off." He says, "And if you breathe loud, bitch, you're dead." I said, "Okay." And I started back to saying "Lord, have mercy." Every time I'd say something he'd say, "Shut, up, Bitch!" I said, "Okay, okay."
 He pulled his shoes off. He didn't bend. He slipped his shoes off like that. He says, "Okay, I'm pulling off my shirt." By this time the light across the gas company along with the light in my bathroom, I'm focusing on his hand. He kept this fist balled up, and he was undoing his shirt. First he threw his cap off, over by a recliner chair. He says, "Okay, I'm taking off my shirt now." He said, "And you better not move." And I'm focusing on his fist to see he's holding something in his hand. He took his shirt off and threw it on the floor. He told me step by step what he was taking off. "I'm taking off my pants." He slipped out of his pants, and he crawled up into bed. And I had my legs together like this, and he shoved my legs open and pulled my gown up, and I had on underwear. He felt me down there and he felt the underwear. He said, "Bitch, take these panties off." I took them off and threw them on the side of the bed. Then he rubbed his hands down between my legs. And I said, "Oh, my God." He said, "What did you say?" He said, "Wait a minute. First, Bitch, you're gonna suck my dick." And I thought, "Oh, my God!" He said — I said, "Okay, okay, come on." He crawled up to the top of the bed, and he sat in a sitting position. I have a tall headboard on my bed, and he sat in a sitting position; and I scooted down in bed and put one foot, braced one of my *Page 644 
feet on the floor, my right foot. And I said, "Where is it? Where is it?"
 And I got it, I grabbed it by my right hand; and when I grabbed it I gave it a yank. And when I yanked it, I twisted all at the same time.
 . . . .
 [Again,] I grabbed his penis with my right hand, and I twisted and pulled it all at the same time. And he hit me with his right hand a hard blow beside the head, and when he hit me I grabbed ahold to his scrotum with my left hand and I was twisting it the opposite way. He started to yell and we fell to the floor, and he hit me a couple more licks; but they were light licks. He was weakening some then. Then he leaned over across me and bit me on my right shoulder. While he was biting me I was still hanging onto him, and then I got his neck with my mouth and started biting it. Then I thought, "Well, he might have Aids," [sic] and I let go of his neck, still holding onto him. And he was tussling and trying to hit me and trying to get out of the way, and I don't know how we managed to get out of the bedroom into the hallway. He was trying to get out, and I'm hanging onto him; and he was throwing me from one side of the hall wall to the other.
 . . . .
 . . . I was afraid if I let him go he was going to kill me.
 . . . .
 [H]e was a young man, I could see he was a young man, and I've never gone through anything like this before. I didn't have anything to defend myself with.
 . . . .
 So I was determined I was not going to turn it aloose. So we were going down the hallway, falling from one side to the other, and we got into the living room and we both fell. He brought me down right in front of the couch, and he leaned back against the couch like this, pleading with me. Well, at that point the night light from the bathroom was shining right across his forehead, and I'm still hollering at him; and I start using some curse words to him. I said, "Goddamn it —"
 . . . .
 He was pleading. He says, "You've got me. You've got me. Please, you've got me." I said, "I know Goddman well I've got you." He said, "Please, please, you're killing me; you're killing me." I said, "Well, die, son-of-a-bitch." I said, "Die, then." I said, "Son-of-a-bitch, you just won't die for me, will you?" And I couldn't get him to die. He said, "I can't do nothing; I can't do nothing. Call the police; call the police." I said, "Do you think I'm stupid enough to turn you aloose and call the police?" He said, "Well, what am I gonna do?" I said, "You're gonna get the Goddamn hell out of my house." He said, "Well, how can I get out of your house and you won't let me go?" He said, "How can I get out? I can't get out." I said, "Break out, son-of-a-bitch; you broke in, didn't you?" And I was still holding him.
 He said, "I can't do nothing." He said, "Oh, you've got me suffering. Lady, you've got me suffering." He said, "Woman, you've got me suffering." I said, "Have you thought about how you were going to have me suffering?" He said, "Well, I can't do nothing now." I said, "Well, that's fine." I said, "And we'll stay right here until my brother comes. He'll be here at five o'clock anyway."
 So I said, "I've got two locks on my door, a deadbolt lock and a night lock." And I said, "Damn it, you're gonna undo both of them." So we go to the door. We fumble to the door. He gets up to the lock and he's in so much pain he'd come back down to the floor and I'd make him get back up to the locks. So he managed to get one aloose and he pulled it. He said, "I'm out." I said, "No, there's another one." He undid that one. He still thought he was out. I said, "The screen door is locked." And he undid the screen door. He said, "I'm out! I'm out!" I said, "No, damn it, come on. You're going to the end of the porch." I said, "I'm taking your ass to *Page 645 
the end of the porch." I said, "And when I turn you aloose, I'm going to go get my gun and I'm going to blow your mother-fucking brains out." I said, "You nasty, stinking, lowdown, dirty piece of shit, you!" And when I did that I gave it a twist, and I turned him aloose. And he made a couple of steps and then he fell off of the steps and he jumped up and took his right hand and grabbed down here his private area, and made a couple of jumps across the back of my aunt's car. And I ran into my aunt's room, got her pistol from underneath the nightstand, ran back to the screen door, and I fired two shots down the hill the way I saw him go. And then I ran back into the house and dialed 911 and called my brother, and he came over.
Record Vol. II, at 89-94.
The victim also called the Hinds County Sheriff's Department; Deputy Dennis Moulder responded to her call. Moulder recovered Coverson's clothing which Coverson had left behind in the victim's bedroom. Deputy Moulder found the words, "Dwight Coverson," written on the inside of the pants' front pocket. At approximately 4:15 a.m., Moulder drove to Coverson's home — located near the victim's home — and arrested him and transported him to the Hinds County Jail.
Moulder advised Coverson of his rights, but he did not interview him until about six hours later — around 11:00 a.m. At that time, Moulder again advised Coverson of his rights. Coverson responded that he understood his rights and wanted to talk. He confessed that he broke into the victim's home — thinking no one was home — to commit a burglary. He also admitted to being under the influence of drugs and alcohol at the time of the incident.
A Hinds County Grand Jury indicted Coverson for burglary and attempted sexual assault. The trial resulted in a guilty verdict against Coverson.[2] Coverson received a five-year sentence for the burglary and a 20-year sentence for the attempted sexual-assault, the sentences to run consecutively.
Coverson appealed and presented several issues for this Court's analysis.
 II. ANALYSIS A. Issue # 1: Whether the State Erroneously Struck Three Prospective Jurors 1. Coverson's Contention
During voir dire, the State challenged for cause eight prospective jurors; the judge allowed six of these challenges. Coverson questioned the validity of three of these six challenges.
The first challenge involved prospective juror, Ruby Frazier. Frazier informed the judge and attorneys that she had known Coverson, his mother, and brothers "on a friendly basis" for as long as "fifteen years." She later conceded that she considers Coverson to be her "friend." The judge allowed the State's challenge and excused Frazier. The judge briefly explained the basis of his decision: "[J]ust knowing the defendant's mother would surely not be a significant basis to excuse a juror. But there is certainly much additional evidence to indicate to the Court that this juror should be excused for cause."
The second prospective juror excused for cause — C.W. Thompson — also admitted that he had known Coverson and his family. In fact, Thompson noted that he had known Coverson all his life and that he had lived only four or five houses away from Coverson's.
The third prospective juror excused for cause — Chester Moore — admitted that he had known Coverson and his family all his life. He added that he had known Coverson's (deceased) father for over 35 years and that he had worked with Coverson's uncle on a daily basis for years.
Coverson contends that, the foregoing notwithstanding, the judge should not have allowed the State's challenges since the prospective jurors stated that they could be fair and impartial. *Page 646 
 2. Application of Relevant Law
Coverson's contention is rejected on both substantive and procedural grounds.
On substantive grounds, statutory and case law empowered the judge with broad discretion to determine whether a prospective juror can be impartial — notwithstanding the juror's admission under oath that he or she can be impartial. See Burt v. State,493 So.2d 1325, 1327 (Miss. 1986) ("It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially.") (citing cases); Miss. Code Ann. § 13-5-79 (1972).
On procedural grounds, once the judge exercised his discretion and determined that the jurors probably could not be impartial, then the determination may not be assigned on appeal as an error:
 Any person . . . who will make oath that he [or she] is impartial . . . shall be competent as a juror in any criminal case. . . . Any juror shall be excluded however, if the court be of opinion that he [or she] cannot try the case impartially, and the exclusion shall not be assignable for error.
Miss. Code Ann. § 13-5-79 (1972).
In short, the important and long-established maxim has been: (1) that a defendant has no right to have specific prospective jurors try his or her case, and (2) that the defendant cannot complain on appeal of a particular exclusion if the end result was a jury composed of fair and impartial jurors. See Sherman v.State, 108 So.2d 205, 207 (Miss. 1959); Sullivan v. State,155 Miss. 629, 125 So. 115, 117 (1929). Coverson does not complain that the jury which tried his case was not fair and impartial. He only complains that the judge should not have excused for cause his three life-long friends — Frazier, Thompson, and Moore. Applying the law to the evidence, this Court concludes that Coverson has failed to prove that the judge abused his discretion. The judge obviously felt that the three prospective jurors could encounter difficulty with a decision to send their friend to prison for 25 years. Surely, one cannot find fault with the judge for making such a reasonable and cautious determination.
In sum, this Court affirms on this issue on procedural grounds (i.e., statutory law barred Coverson from raising this issue on appeal) and on substantive grounds (i.e., Coverson failed to prove that the judge's decision constituted an abuse of discretion).
B. Issue # 2: Whether Coverson's Incriminating Statements Should Have Been Suppressed 1. Coverson's Contention
As noted in Section I of this opinion, Deputy Moulder twice read Coverson his Miranda rights — after which Coverson made incriminating statements which amounted to a confession. Prior to trial, Coverson filed a motion to suppress any testimony regarding those statements. The judge held a suppression hearing. During the hearing, Coverson did not deny that Moulder had read him his rights, and he did not deny that he had made the incriminating statements. Coverson contended that he could not recall whether Moulder advised him of his rights, and he could not recall waiving them. He blamed his poor recollection on his use of drugs and alcohol on the night of the sexual assault. Thus, he concluded, he could not have waived his Miranda rights intelligently, knowingly, and voluntarily; and his incriminating statements should be suppressed. The judge did not agree and denied his motion. In this appeal, Coverson contends that the judge erred.
 2. Relevant Law
The constitutional principles governing custodial interrogation are well-established — albeit they often evade one's comprehension. One principle dictates that custodial interrogation must be preceded by advice to the putative defendant regarding the Fifth Amendment rights to remain silent and to have an attorney present. Miranda v. Arizona,384 U.S. 436, 479, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694, 726 (1966). If the right to remain silent is invoked, "the interrogation must cease." If the *Page 647 
right to have an attorney present is invoked, "the interrogation must cease until [one] is present." Id., quoted in Edwards v.Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1880, 68 L.Ed.2d 378, 386 (1981); see also Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488, 493-94 (1984) (per curiam) (This is a "rigid prophylactic rule."). Under either circumstance, interrogation may commence or resume in the absence of an attorney if the putative defendant: (1) "initiated further discussions with the police"; and (2) "knowingly and intelligently [and voluntarily] waived the right . . . invoked."Smith, 469 U.S. at 95, 105 S.Ct. at 492, 83 L.Ed.2d at 494;United States v. Gotay, 844 F.2d 971, 976 (2d Cir. 1988).
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the [State]" to prove beyond a reasonable doubt the validity of a defendant's waiver of his "privilege against self-incrimination and his right to retained or appointed counsel." North Carolinav. Butler, 441 U.S. 369, 372-73, 99 S.Ct. 1755, 1757, 60 L.E.2d 286, 291-92 (1979) (quoting Miranda, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 706).
Specifically, Miranda requires proof that "the waiver [was] made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707, quoted in Nash v. Estelle,597 F.2d 513, 518 (5th Cir. 1979); see Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 ("[W]aivers of counsel must not only be voluntary, but also must constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege."); Gotay, 844 F.2d at 976 (same) (citing Smith,
469 U.S. at 95, 105 S.Ct. at 492-93, 83 L.Ed.2d at 1494); Terryv. LeFevre, 862 F.2d 409, 412 (2nd Cir. 1988) (same); Grooms v.Keeney, 826 F.2d 883, 887 (9th Cir. 1987) (same); Neal v.State, 451 So.2d 743, 753 (Miss. 1984) (same); Abston v.State, 361 So.2d 1384, 1391 (Miss. 1978) (same).
In short, "[a] waiver is voluntary if it is `the product of a free and deliberate choice rather than intimidation, coercion or deception.'" Moreover, "[a] waiver is knowing and intelligent
if it is `made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" Grooms, 826 F.2d at 887 (quoting and citing cases) (emphasis added).
In the case sub judice, the trial judge concluded that the State met its burden. Whether this conclusion is correct is a mixed issue of law and fact. Norman v. Ducharme, 871 F.2d 1483, 1486 (9th Cir. 1989); Terrovona v. Kincheloe, 852 F.2d 424, 428 (9th Cir. 1988). This Court must first conduct an independent review of the totality of the circumstances discoverable in the entire record in order to resolve the questioned validity of a confession or incriminating statements. Accord State v.Whitaker, 578 A.2d 1031, 1039 (Conn. 1990) ("Where the trial court makes specific factual findings regarding [this issue], those findings are entitled to deference so long as they are supported by substantial evidence, but where, as here, the trial court has made no specific findings, we must review the evidence and make our own determination of the circumstances surrounding the defendant's waiver of his constitutional rights."), quotedwith approval in Holland v. State, 587 So.2d 848, 860 (Miss. 1991); see Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 (review should focus on the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused") (quoting Johnson v.Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)); Whitaker, 578 A.2d at 1039 (review should focus on defendant's "experience with the police and familiarity withwarnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation"). Accordingly, the following is a recitation of relevant evidence.
 3. Recitation of Relevant Evidence
During the suppression hearing, Deputy Moulder testified that he twice advised *Page 648 
Coverson of his Miranda rights and that Coverson responded that he understood those rights.
In response to leading questions posed by his attorney, Coverson testified that he was under the influence of drugs and alcohol and that he could not "recall" being advised of his rights or having waived them. Coverson conceded that he may have been advised of his rights and that he may have waived them; however, he contended that, in view of his intoxicated state of mind, he could not have knowingly, intelligently, or voluntarily waived his rights.
Under questioning by the State, Coverson made surprising admissions which unequivocally support the judge's conclusion that Coverson knowingly, intelligently, or voluntarily waived his rights. Coverson admitted that, at the time of his arrest, heknew and understood what his rights were. In fact, he knew them so well, that he recited them during the hearing:
 State: You knew what your rights were?
 Coverson: Yes, I knew what my rights were.
 State: You had heard of that before?
 Coverson: I had heard of it before.
 State: What is your understanding that a criminal person arrested for a crime has the rights to?
 Coverson: He has a right to an attorney if he can't afford one.
 State: All right. What else?
 Coverson: And a right to remain silent.
 State: Okay. And what would happen if he couldn't afford an attorney?
 Coverson: One would be appointed to him.
 State: And what happened if he spoke? What could they do with what he said?
 Coverson: It could [be used to] incriminate him.
 State: It could be used against him, is that right?
 Coverson: It could be used against him.
 State: And you understood all of that when you were arrested, is that right? You'd known that for a long time?
 Coverson: Yeah.
 State: How long have you known that?
 . . . .
 Coverson: You can say maybe three, four years. . . .
Rec. Vol. II, at 150-51. Coverson went on to explain that he had known and understood the Miranda rights by watching crime shows on television, by "read[ing] it in the [news]paper," and by hearing police officers advise others who were being arrested "on the streets." And Coverson's familiarity with Miranda rights is also attributable to his experience as a criminal suspect. That is, Coverson admitted that he has twice been arrested — once as recently as four months prior to his arrest in the case subjudice — and that police officers read him his Miranda rights each time. See Hovland v. Blodgett, 914 F.2d 262 (9th Cir. 1990) (defendant's "past experience with the judicial system" factored into the court's decision that he "knew how to request counsel" and "knowingly waived his Miranda rights") (unpublished opinion).
 4. Application of Law
The foregoing constitutes strong, if not incontrovertible, evidence of the requisite state of mind — i.e., that Coverson knowingly, intelligently, and voluntarily waived his rights beyond any reasonable doubt. But this does not necessarily constitute the entire picture. In addition to the evidence recited in the preceding section, the following evidence discredits Coverson's tenuous contention that he was too intoxicated to know and understand his rights. Moulder arrested Coverson and advised him of his rights around 4:15 a.m. Over sixhours later, around 11:00 a.m., Moulder again advised Coverson of his rights — after which Coverson uttered the incriminating statements. Thus, six hours had passed from the time of his arrest to the time he had uttered the statements. During these six hours, Coverson slept and arguably "sobered up." In other words, he could not have been as intoxicated as he contended during the suppression hearing. Accord United States v.D'Antoni, 856 F.2d 975, 981 (7th Cir. 1988) ("The defendant had been drinking and smoking marijuana during the past twenty-four hours. . . . The defendant himself, however, testified that *Page 649 he had had no alcohol in the five or six hours prior to theinterview, and that he understood the detectives' questions. . . . We agree . . . that the defendant's statements to the detectives were made voluntarily.").
 5. Disposition
In sum, substantial evidence can be gleaned from the preceding discussion to support the judge's conclusion that Coverson had the requisite state of mind to waive his rights. Accordingly, this Court affirms on this issue. See Schmitt v. State,560 So.2d 148, 151 (1990).
C. Issues # 3 # 4: Whether the Judge Erred in Instructing the Jury on Attempted Sexual Battery and in Denying Coverson's Motion for Judgment Notwithstanding the Verdict (j.n.o.v.)? 1. Coverson's Contention
Through these consolidated issues, Coverson contends that the judge erred in granting an instruction on attempted sexual battery and in denying his motion for judgment notwithstanding the verdict "since the evidence adduced at trial failed to prove [that he] made any overt act to attempt to commit sexual battery." More specifically, Coverson contends that the judge erred because the record is devoid of any evidence to prove that he attempted "to penentrate Ms. Lloyd vaginally."
 2. Relevant Law
The Hinds County Grand Jury indicted Coverson for attempted sexual battery under Miss. Code Ann. § 97-1-7 (1972) and §97-3-95 (Supp. 1992). Vol. I, at 1. Section 97-1-7 defines the crime of "attempt." Section 97-3-95 defines the crime of sexual battery: "A person is guilty of sexual battery if he or she engages in penetration with: (a) Another person without his or her consent. . . ." Finally, Miss.Code § 97-3-97 (Supp. 1992) provides that "penetration" includes "cunnilingus, fellatio [and] any penetration of the genital or anal openings."
 3. Application of Law
As noted, Coverson contends that the record is devoid of any evidence of an attempt to penetrate Lloyd vaginally. This is the fatal flaw in Coverson's contention: His mistaken belief that sexual battery involves penetration of only the vagina.
Unfortunately for Coverson, § 97-3-97 expressly provides that sexual battery includes fellatio (i.e., oral sex). Attempting to penetrate Lloyd orally is exactly the crime for which the State prosecuted Coverson. Attempting to penetrate Lloyd orally is exactly what Coverson admits to doing: "At this point the defendant [Coverson] ordered Ms. Lloyd to perform oral sex. . . ." See Coverson's Brief at 15. Thus, without question and based on Coverson's own admission, one is left with no other conclusion but that the judge properly instructed the jury on attempted sexual battery and properly denied Coverson's judgment not withstanding the verdict.
In sum, this Court affirms on this consolidated issue.
 III. CONCLUSION
Based on the foregoing analysis, this Court affirms the conviction and sentence.
CONVICTIONS OF BURGLARY AND SENTENCE OF FIVE YEARS AND ATTEMPTED SEXUAL-ASSAULT, AND SENTENCE OF TWENTY YEARS, TO RUN CONSECUTIVELY, AFFIRMED.
DAN M. LEE, P.J., SULLIVAN, PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
HAWKINS, C.J., specially concurs with separate written opinion joined by DAN M. LEE, P.J., and SMITH, J.
[1] The facts are recounted in a light most favorable to the verdict.
[2] Coverson did not testify in his defense; he merely rested at the close of the State's case.