# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00512-COA

JAKIA THOMAS                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                              APPELLEE

DATE OF JUDGMENT:            03/01/2023
TRIAL JUDGE:                 HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED:   HINDS COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:     MARCUS AMIR WILLIAMS
                             KEVIN BRIAN BASS
                             LAWRENCE STEPHEN BLACKMON
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           JODY EDWARD OWENS II
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 03/25/2025
MOTION FOR REHEARING FILED:

EN BANC.

WESTBROOKS, J., FOR THE COURT:

¶1.     Jakia Thomas was convicted of the second-degree murder of her boyfriend, DeMarcus Harris. On appeal, she argues that the trial court made errors in the admission and exclusion of evidence, her conviction was against the sufficiency and weight of the evidence, and cumulative error warrants reversal. After review, we find no reversible error and affirm.

## FACTS

¶2.     In December 2018, Thomas and Harris lived together with their five-month-old child in Jackson, Mississippi. They had been dating for approximately a year and a half to two

years. On December 27, 2018, Harris's mother, Janice Harris, called Harris and asked him if her boss could borrow a commercial-grade dolly. Harris agreed. Around 12:30 p.m., he let Janice know that he was picking up pizza for their lunch, and he arrived at Janice's workplace in Jackson with the pizza and dolly around 1 p.m. Janice testified that Harris was in good spirits and was happy to learn that her boss possibly had a job opportunity for Harris. Harris left between 3:15 and 3:45 p.m. Janice called him approximately thirty minutes after he left to let him know that she had given Harris's phone number to her boss, and Harris was "fine" during their conversation.

¶3. Harris's brother, Lynn Harris, testified that he called Harris between 4:30 and 5:30 p.m., and they spoke on the phone for about twenty minutes and discussed meeting up that evening to smoke weed. Before they ended the call, Harris said to "give him 20 minutes." Lynn testified that Harris seemed normal during their conversation.

¶4. At approximately 5:43 p.m., shortly after Harris hung up with his brother on the phone, Thomas called 911 and reported that Harris had shot himself in their home. An ambulance was dispatched and arrived at the home at 5:57 p.m. Officer Zekia Lewis with the Jackson Police Department was the first officer on the scene. She testified that when she arrived, Thomas was crying and saying, "[H]elp him, help him, he tried to harm himself." Officer Lewis testified that the scene did not seem "normal" to her. Harris was sitting slumped over in a chair, a framed picture of a woman "was laying in both of his hands, and he was tilted over to the right." Officer Lewis noted that although she later learned from Thomas that Harris was right-handed, Harris had been shot in the back-left side of his head,

2

and a gun was on the floor to his left. He was moving and able to talk, although she could not understand what he was saying. Officers later identified the woman in the photograph as Harris's sister, who had died in a car accident two years prior.

¶5. Thomas told Officer Lewis that prior to Harris being shot, she and Harris had an argument, and Harris was holding a photograph of his deceased sister and saying, "I want to go with you." Thomas told Officer Lewis that Harris "had just been crying a lot and just sitting in that chair holding this picture of his deceased sister." Officer Lewis testified that Thomas told her that Harris had been holding a gun to his head, and when she tried to take it from him, the gun discharged.

¶6. Officers examined the gun that was found on the floor to Harris's left and found a stove-piped shell casing lodged inside. A second shell casing fell from Harris's body onto the front porch as paramedics were transporting him on a stretcher from the house. Harris died four days later in the hospital. An autopsy showed that Harris's cause of death was a gunshot wound to the head, and the manner of death was homicide.

¶7. After Harris was taken to the hospital, Thomas was immediately detained for questioning. After waiving her *Miranda*[1] rights, she told officers that she and Harris had been arguing for the past few days because Harris had commented, "I'm hungry," on another woman's Facebook post showing food the woman was preparing. Thomas explained that she told Harris, "You a man that's taken you can't be saying you're hungry they are going to take that as I ain't feeding you or any other thing." Thomas said that Harris did not understand

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

how his comment was disrespectful. Thomas maintained that Harris shot himself as she was attempting to stop him. Gunshot residue was found on Thomas's and Harris's hands.

¶8. Thomas was indicted in the Hinds County Circuit Court for the first-degree murder of Harris. After a jury trial, Thomas was found guilty of second-degree murder. On March 1, 2023, the circuit court sentenced Thomas to serve thirty years in the custody of the Mississippi Department of Corrections. The circuit court denied Thomas's motion for a judgment notwithstanding the verdict or a new trial, and Thomas appealed.

¶9. On appeal, Thomas argues that this Court should reverse her conviction for the following reasons: (1) the circuit court erred in granting the State's motion to exclude a Facebook post that she alleges was pertinent to Harris's mental state; (2) the circuit court erred in denying her motion for a directed verdict based on the *Weathersby* rule;[2] (3) the evidence was insufficient to support the conviction; (4) the verdict was against the overwhelming weight of the evidence; (5) the circuit court erred in allowing the medical examiner to testify outside his area of expertise and give rebuttal testimony; (6) the circuit court erred in denying her motion to suppress her statement to police; (7) the circuit court erred in permitting the introduction of gruesome photographs; and (8) cumulative errors deprived her of a fair trial.

## DISCUSSION

### I. Admission of Facebook Post

¶10. Thomas's defense at trial was that Harris was depressed following his sister's death

---

[2] *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933).

4

two years prior in a car accident and shot himself while Thomas tried to stop him from committing suicide. Thomas sought to introduce into evidence a post from Harris's Facebook page that Thomas contends supported her theory that Harris had a suicidal mental state. The post was made on May 24, 2018, approximately seven months prior to Harris's death on December 27, 2018. The post stated in its entirety, "Just trying to have a life of happiness, but I'm starting to feel like I shouldn't have a life at all."

¶11. Prior to trial, the State moved to exclude the post on the basis that it was too remote in time and not relevant under Mississippi Rule of Evidence 401. Alternatively, the State argued that the post was improper under Mississippi Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice, the post could be misleading to the jury, and it could not be authenticated. The circuit court granted the motion, finding that the Facebook post was "of no relevance to the hearing matter and remote in time."

¶12. "The standard of review regarding admission or exclusion of evidence is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 71 (¶9) (Miss. 2010). We will not disturb an evidentiary ruling "unless the error adversely affects a substantial right of a party." *Id.* (quoting *Mingo v. State*, 944 So. 2d 18, 28 (¶23) (Miss. 2006)). "Evidence that is remote in time or is otherwise far-removed from an issue at trial is not relevant under M.R.E. 401 and may be excluded by the trial court in the exercise of discretion." *Tillis v. State*, 661 So. 2d 1139, 1142-43 (Miss. 1995).

¶13. Thomas cites *Parr v. State*, 362 So. 2d 634, 636 (Miss. 1978), where the Supreme

5

Court found no error in the trial court's admission of threats made by the defendant thirteen months before the killing. However, there is a key distinction between this case and *Parr*. In *Parr*, the Supreme Court considered that a continuing course of conduct existed between the defendant and victim between the period before the threats and up until the murder. The court noted, "The record indicates that for a period before the threats were made up until the date of the homicide, there was hostility, bitterness, and ill will between appellant and his wife [(the deceased)]. Such a situation rendered the threats relevant and competent." *Id.*

¶14.    Similarly, in *May v. State*, 524 So. 2d 957, 960 (Miss. 1988), a witness testified that the defendant, Dorothy May, had told her the year prior to May's husband's death that she had tried to poison her husband. On appeal, May argued that the trial court erred in not striking the statement as too remote in time. *Id.* at 965. The Supreme Court found no abuse of discretion because even if the statement was too remote in time, "several other persons testified to similar threats" that May made leading up to the murder, including a threat made by May less than a week prior to her husband's death. *Id.* Therefore, the court found that even if the admission of the remote statement was error, it "was surely harmless" given the testimony of "a more contemporaneous threat." *Id.*

¶15.    Here, no evidence was presented that Harris continued to make similar allegedly suicidal statements or exhibit suicidal behavior between his Facebook post and his death seven months later. Therefore, even if Thomas is correct that Harris's Facebook post showed he had suicidal thoughts seven months prior to his death, there is no evidence that those suicidal thoughts continued until his death. To the contrary, the State presented evidence that

Harris did not dwell on his sister's death and was generally happy.

¶16.    Harris's mother, Janice, testified for the State regarding the events on the day of Harris's death and her knowledge of his mental state following his sister's death.  Janice testified that after her daughter, Harris's sister, died in a car accident, Harris and his brother were "torn to pieces."  But, over time, they got better; "[i]t was a normal grief.  At first it may have been unbearable, but as time has went by, you know, they are fine."  Janice testified as follows regarding Harris's mental state in December 2018 just prior to this death: "[I'm] not saying that he didn't grieve his sister, but he didn't have mopey feelings or anything like that.  He was back to normal. . . .  [H]e was a happy kid . . . ."

¶17.    Janice testified that she regularly spoke to Harris on the phone.  On the morning of Harris's death, she called him and asked if her boss could borrow a commercial-grade dolly.  Harris agreed and brought the dolly and pizza for himself and Janice around 1 p.m.  Janice's boss asked Janice what type of work Harris did and then asked if Harris "would look at the property and let [him] know how much [Harris] would charge initially to do a cleanup for [him] and to continue—do the upkeep on it at least once a month."  When Janice relayed this message to Harris, she said that Harris "was ready to work.  He says, well, can I start today[?] . . . [H]e was excited.  He was calling people about the little job."  Janice testified that Harris left between 3:15 and 3:45 p.m., and she called him around thirty minutes later to tell him that she was giving her boss Harris's phone number.  Janice testified that during the conversation, "[h]e was fine."  She testified that he had never expressed having any mental-health issues to her.  Finally, she was asked if he ever said anything between the ages of

7

twenty-five and the time of his death at age thirty-two regarding "if something was concerning him"; she answered no. Harris's brother, Lynn, testified that he spoke to Harris on the phone moments before Harris's death. He testified that Harris seemed "normal" during their conversation; he was not depressed or sad, and they did not discuss their sister.

¶18. We cannot find that the circuit court abused its discretion in excluding the Facebook post as too remote in time and irrelevant to show Harris's state of mind at the time of his death. The Facebook post was made seven months prior to Harris's death, and there was no evidence that Harris continued to make such statements or exhibit any behavior that would support Thomas's theory that Harris continued to have suicidal thoughts. The circuit court did not abuse its discretion in excluding the Facebook post.

## II.    *Weathersby* Rule

¶19. Thomas argues that she was entitled to a directed verdict of acquittal under the *Weathersby* rule. Our Supreme Court has held that motions "for a directed verdict and judgment notwithstanding the verdict (JNOV) challenge the legal sufficiency of the evidence supporting the guilty verdict," that the "standards of review for a denial of directed verdict and JNOV are identical," and that reversal is warranted where, viewing the evidence in the light most favorable to the verdict, a reasonable and fair-minded juror could only find the accused not guilty. *Croft v. State*, 992 So. 2d 1151, 1157 (¶24) (Miss. 2008).

¶20. The *Weathersby* rule states:

> Where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common

8

knowledge.

*Childress v. State*, 395 So. 3d 1243, 1247 (¶27) (Miss. 2024) (quoting *Weathersby*, 147 So. at 482). "Where the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Johnson v. State*, 987 So. 2d 420, 424 (¶10) (Miss. 2008). The applicability of the *Weathersby* rule is a determination for the court, not the jury. *Id.* "[I]t is a rare case that meets all of the requirements of the *Weathersby* rule." *McQuarters v. State*, 45 So. 3d 643, 650 (¶21) (Miss. 2010) (quoting *Sartain v. State*, 311 So. 2d 343, 345 (Miss. 1975)). Where factual issues exist, the case must be submitted to the jury. *Id.*

¶21. It is undisputed that Thomas and her and Harris's infant child were the only ones in the home when Harris was shot. At the close of the State's case-in-chief, Thomas moved for a directed verdict in part based on the *Weathersby* rule. The circuit court denied the motion. Thomas argues that she was entitled to a directed verdict because she was the only witness to the shooting, and the State failed to present substantial evidence to contradict her account of the events. Thus, she asserts that her version of events must be accepted as true.

¶22. Thomas's account of Harris's shooting was that Harris was holding a gun while crying and holding a picture of his deceased sister, and he was saying, "I want to go with you." She approached Harris in an attempt to prevent him from shooting himself, and through accident and misfortune, the gun went off.

¶23. However, the State presented evidence that contradicted Thomas's version of events. For instance, Officer Lewis testified that the scene of the shooting did not appear normal to

her or consistent with Thomas's assertion that Harris shot himself. Officer Lewis testified that it appeared the gun used in the shooting had been fired twice because a shell casing was found stove-piped in the gun, and another fell from Harris's body as he was being transported by paramedics. Further, Officer Lewis noted that despite Thomas's statement to her that Harris was right-handed, he was shot in the left side of his head behind his ear, he was slumped over to the right, and the gun was on the ground on his left side. Dr. Mark LeVaughn, a state forensic medical examiner, testified that the manner of death was not consistent with a suicide because there was no evidence that the gun was in close range to Harris's head when it was fired.

¶24. We cannot find that the *Weathersby* rule applies here. Not only did Officer Lewis testify that the scene appeared inconsistent with Thomas's version of events, but Dr. LeVaughn testified that the manner of death was homicide and inconsistent with suicide. Dr. LeVaughn's "expert testimony [regarding the manner of death], admissible under our rules of evidence, substantially contradicted [Thomas's] version of the incident and created a question for the jury to resolve." *Booker v. State*, 64 So. 3d 965, 975-76 (¶33) (Miss. 2011).

¶25. The circuit court did not err in denying Thomas's motion for a directed verdict on this issue and submitting these factual issues to the jury to decide. This issue is without merit.

### III. Sufficiency of the Evidence

¶26. We review a challenge to the sufficiency of the evidence de novo. *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022). When reviewing the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution to determine whether

10

rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime" beyond a reasonable doubt. *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (emphasis and internal quotation marks omitted).

¶27.    Second-degree murder is a killing "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). A finding of intent to kill is not required. *McCool v. State*, 328 So. 3d 173, 183 (¶39) (Miss. Ct. App. 2021). However, the defendant's conduct must be "so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life." *Montana v. State*, 822 So. 2d 954, 967 (¶55) (Miss. 2002).

¶28.    The jury heard Thomas's theory of the case that Harris was holding the gun and crying about his deceased sister while holding her picture, and Harris was shot while Thomas was trying to prevent Harris from committing suicide. The jury also heard evidence that Thomas and Harris had been arguing prior to the shooting and that the crime scene and autopsy report showed Harris's death was not consistent with suicide. Specifically, the jury heard that Harris, who was right-handed, was shot in the left side of the head, the gun was found on the ground to his left, and the autopsy showed no indication that the gun was in close range to Harris's head when it was fired. The jury was also told that it appeared that the gun had been fired twice and that it was not reasonable to believe Harris could have fired the gun a second time after sustaining the injury from the first shot.

¶29.    Viewing the evidence in the light most favorable to the State, a rational juror could

11

find that Thomas shot Harris and, in doing so, committed "an act eminently dangerous to others and evincing a depraved heart, regardless of human life[.]" Miss. Code Ann. § 97-3-19(1)(b). Therefore, we find the evidence was sufficient to prove each essential element of second-degree murder beyond a reasonable doubt.

### IV. Weight of the Evidence

¶30. "A request for a new trial is a challenge to the weight of the evidence." *Haymon*, 346 So. 3d at 883 (¶23). "The trial court's grant or denial of a new trial is reviewed under an abuse of discretion standard, and the evidence is viewed in the light most favorable to the verdict." *Id.* (citing *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017)). "We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Jones v. State*, 390 So. 3d 498, 503 (¶20) (Miss. 2024) (quoting *Whitten v. Cox*, 799 So. 2d 1, 13 (¶26) (Miss. 2000)).

¶31. Thomas argues that the verdict of second-degree murder was against the overwhelming weight of the evidence because the State presented no evidence that she took "any hostile action" toward Harris prior to his death; rather, she called 911 and sought help for Harris after he was shot. She further argues that the State failed to show a motive for the murder and that the State's theory regarding how Harris was shot was not supported by scientific testing or physical evidence but, instead, was based on speculation.

¶32. Thomas further argues that the testimony of her expert witness "should hold considerable weight given the facts and circumstances of this case, in addition to the lack of

evidence detailing the shooting presented by the State." Eric Warren, who was tendered as an expert in the "field of shooting incident reconstruction and firearms," testified for the defense. Warren testified that based on summaries of the crime scene, Thomas's interview with the police, and the medical evidence, "the scenario that is most consistent with all of that evidence as a whole is . . . in agreement with the recounting of events that Ms. Thomas told to the Jackson Police Department."

¶33. To the contrary, the State presented evidence that Harris's manner of death was not consistent with the account Thomas gave to police. Both the medical examiner who performed the autopsy and the medical examiner who testified at trial agreed that Harris's death was a homicide. Law enforcement found it was not plausible that Harris, who was right-handed, shot himself in the back of his head on the left side. As motive for the murder, the State presented evidence of an ongoing argument between Harris and Thomas regarding a Facebook comment that Harris made on another woman's post. Thomas acknowledged that she and Harris had been arguing over it prior to his death.

¶34. While Thomas argues that the State's evidence was speculative and the substantial weight of the evidence weighs in her favor, we must acknowledge that "where the verdict turns on the credibility of conflicting testimony and the credibility of the witness, it is the jury's duty to resolve the conflict." *Wilson v. State*, 343 So. 3d 1041, 1051 (¶47) (Miss. 2022). "'[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness.'" *Young v. State*, 236 So. 3d 49, 57 (¶35) (Miss. 2017) (quoting *Meshell v. State*, 506 So. 2d 989, 992 (Miss. 1987)).

¶35. Viewing the evidence in the light most favorable to the verdict, we cannot find that the jury's verdict was against the overwhelming weight of the evidence. The circuit court did not abuse its discretion by denying Thomas's motion for a new trial.

### V. Admission of Medical Examiner's Testimony

#### a. Scope of Expert Testimony

¶36. Thomas argues that State Medical Examiner Dr. LeVaughn's testimony was outside the scope of his expertise and mere speculation. Specifically, she argues that Dr. LeVaughn was unqualified to testify as to the manner of Harris's death, bullet trajectory, and distance of the gun from Harris's body because (1) he did not personally view Harris's body or the crime scene or speak with witnesses, and (2) he "is not a shooting incident scene reconstructionist."

¶37. The trial court acts "as gatekeeper on questions of admissibility of expert testimony." *Chisholm v. State*, 365 So. 3d 229, 241 (¶43) (Miss. 2023). "This Court reviews the trial court's admissibility determination for abuse of discretion." *Corrothers v. State*, 148 So. 3d 278, 295 (¶28) (Miss. 2014).

¶38. No specific objection was made at trial regarding Dr. LeVaughn's qualification to testify as to Harris's cause or manner of death based on the fact that Dr. LeVaughn was not present for the autopsy. Nor was there any objection made that Dr. LeVaughn impermissibly testified regarding the trajectory of the bullet through Harris's head. Therefore, this issue is waived for appeal. *Brady v. State*, 337 So. 3d 218, 227 (¶27) (Miss. 2022) (stating that issues not presented to the trial court are waived). Thomas argues that the issue is not waived

because she continuously objected to Dr. LeVaughn's testimony. While Thomas did object throughout Dr. LeVaughn's testimony, the objections were based on the failure of the State to produce Dr. LeVaughn's report in a timely manner, the authenticity of the autopsy photographs, and Dr. LeVaughn's use of a demonstrative aid.[3] Thomas alternatively argues that the issue should be reviewed for plain error. *See id.* (stating that an issue may be reviewed for plain error "in unusual circumstances" affecting a defendant's substantive or fundamental rights to "prevent a manifest miscarriage of justice").

¶39. Because there was no objection made at trial to Dr. LeVaughn's qualifications or his ability to give his opinion on the cause and manner of death when he was not present for the autopsy, we find these issues are waived. We also find the issues are not appropriate for plain error review. Therefore, we decline to address them on appeal.

### b. Rebuttal Testimony

¶40. Thomas argues that the circuit court erred by permitting Dr. LeVaughn to give rebuttal testimony. Thomas called one witness at trial, Eric Warren, an expert on shooting-incident reconstruction and firearms. As part of his testimony, Warren simulated how Harris's gunshot wound could have been self-inflicted. After his testimony, the State announced its

---

[3] Thomas also objected to Dr. LeVaughn's testimony that the lack of soot or stippling on a person indicates "that the gun was fired greater than three feet." Thomas's counsel immediately moved to strike this statement from the record because the testimony regarding the specific distance of three feet was outside the scope of the autopsy report and not timely disclosed to the defense, and the motion was granted. The circuit court instructed the jury to disregard the statement. To the extent that Thomas challenges this specific testimony on appeal, we find the issue without merit because the circuit court instructed the jury to disregard the statement, and "[t]he jury is presumed to follow instructions from the trial court . . . ." *Young*, 236 So. 3d at 57 (¶38).

15

intent to call Dr. LeVaughn, who testified for the State in its case-in-chief as an expert in the field of forensic pathology, back to the stand as a rebuttal witness. The defense objected on the basis that the rebuttal testimony was a backdoor attempt to introduce Dr. LeVaughn's report, which the circuit court had previously excluded, and on the basis that Dr. LeVaughn was not a proper rebuttal witness because he and Warren were certified in two different areas of expertise. The prosecution responded that Dr. LeVaughn's rebuttal testimony would be limited to Warren's testimony regarding "the angle of the projection and stippling." The circuit court overruled the objection and allowed Dr. LeVaughn's rebuttal testimony, limiting it to those two issues.

¶41. During rebuttal, the prosecution asked Dr. LeVaughn if Warren's demonstration regarding the angle of the gun when it was fired was accurate. Dr. LeVaughn responded that "based on the actual true wound path through the head, that animation is not consistent with that." Dr. LeVaughn was not asked about stippling. On appeal, Thomas argues that Dr. LeVaughn was not qualified to rebut Warren's testimony because Dr. LeVaughn is not a firearms expert, and his rebuttal testimony lacked any probative value and could not be substantially countered with a surrebuttal.

¶42. "The determination of whether evidence is properly admitted as rebuttal evidence is within the trial court's discretion." *Jackson v. State*, 840 So. 2d 739, 741 (¶6) (Miss. Ct. App. 2003) (citing *Powell v. State*, 662 So. 2d 1095, 1098-99 (Miss. 1995)). Our Supreme Court has set forth the following guidelines on whether the admission of rebuttal testimony is proper:

Generally, the party bearing the burden of proof must offer all substantive

evidence in its case-in-chief. Where, however, there is doubt as to whether the evidence is properly case-in-chief or rebuttal evidence, the court should resolve the doubt in favor of reception in rebuttal if: (1) its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, and (2) the opposite party would be substantially as well prepared to meet it by surrebuttal as if the testimony had been offered in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal.

*McGaughy v. State*, 742 So. 2d 1091, 1094 (¶12) (Miss. 1999) (citations omitted).

¶43. Dr. LeVaughn's rebuttal testimony was brief, and the defense cross-examined him but did not seek surrebuttal testimony. As a forensic pathologist, Dr. LeVaughn was qualified to testify as to a bullet's trajectory through Harris's head, and his rebuttal testimony was limited to his opinion regarding the accuracy of Warren's demonstration of the trajectory of the bullet through Harris's head. *Galloway v. State*, 122 So. 3d 614, 632 (¶29) (Miss. 2013) ("[A] forensic pathologist may testify as to what produced [a victim's] injuries," including "wounds . . . and the means of infliction of injury," and "what trauma such an injury would produce."). The rebuttal testimony could not have been presented during the State's case-in-chief because the State was unaware that Warren would provide such a demonstration. Dr. LeVaughn offered no additional testimony. For these reasons, we cannot find that the circuit court abused its discretion in allowing Dr. LeVaughn's rebuttal testimony.

### VI. Statement to Law Enforcement

¶44. Before Thomas was interrogated by law enforcement, she was advised of her right to remain silent and her right to counsel. *See Miranda*, 384 U.S. at 444. Thomas waived her *Miranda* rights and signed a waiver-of-rights form. Thomas argues that despite her waiver of rights, her statements to law enforcement, which were given approximately an hour and

17

a half after the shooting occurred, were not voluntary, and the circuit court erred by denying her motion to suppress the statements. Specifically, Thomas argues that she was still in a "very emotional state," and "officers induced her with leniency and promises to speak on her behalf to the judge."

¶45. A valid waiver under *Miranda* "must be voluntary, knowing, and intelligent." *Id.* A "[w]aiver is considered voluntary if it is the result of a 'free and deliberate choice rather than intimidation, coercion or deception.'" *Jordan v. State*, 995 So. 2d 94, 106 (¶31) (Miss. 2008) (quoting *Coverson v. State*, 617 So. 2d 642, 647 (Miss. 1993)). "Knowing and intelligent waiver must be made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks omitted). The State bears the burden to show the waiver was valid. *Id.* "The determination of the voluntariness of a waiver of rights is a mixed issue of law and fact," and this Court "will not reverse a trial court's findings if they were based on appropriate principles of law and supported by substantial evidence." *Id.* at (¶32).

¶46. Despite Thomas's argument that she was coerced into giving inculpatory statements because she was in an emotional state, the interrogation video shows she was calm and able to answer the officers' questions and give a statement. Thomas's argument that the officers coerced her into giving a statement by threatening to speak to a judge about her case is also without merit. The only specific statement by an officer that Thomas cites from the interrogation is as follows:

> So like I told you when he walked out, it's best to tell the truth and exactly what happened. But going before a judge saying, no, she wasn't remorseful,

18

and she shot him. That's all I've got, judge. Instead of saying, judge, they had an argument earlier, it got a little heated, and a gun was involved. It was an accident.

However, Thomas had already given her version of events before the officer mentioned speaking to a judge, and there is no allegation that the officer's statement coerced Thomas to give any further information.

¶47. After review, we find that the circuit court applied "appropriate principles of law," and the circuit court's decision to deny the motion to suppress was " supported by substantial evidence." *Id.* at (¶32). Therefore, we find the circuit court properly admitted Thomas's statements to law enforcement into evidence.

## VII. Autopsy Photographs

¶48. Thomas argues that the circuit court erred in admitting the autopsy photographs marked as Exhibits S-14 E and G, which showed Harris's skull and brain, over her objection on the basis that they were gruesome and provided minimal evidentiary or probative value. Thomas argues that the State introduced other sufficient photographs to identify Harris and the gunshot wound. She asserts that it was undisputed that Harris died of a gunshot wound to the head, and the admission of Exhibits S-14 E and G was unnecessary, highly prejudicial, and improperly inflamed the jury. The circuit court found that while the photographs were gruesome, their probative value was not outweighed by their prejudicial effect.

¶49. We review a trial court's decision to admit a photograph into evidence for an abuse of discretion. *Barfield v. State*, 22 So. 3d 1175, 1181 (¶14) (Miss. 2009). We "must consider whether the pictures were so gruesome and inflammatory as to lack any evidentiary purpose

and, therefore, be inadmissible." *Id.* "[P]hotographs have evidentiary value when they (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; and (3) supplement or clarify witness testimony." *Id.* at (¶15) (quotation marks omitted). "*Some probative value* is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (emphasis added) (quoting *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)). "So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory." *Id.* Gruesomeness alone will not render a photograph inadmissible in a murder trial; it is not unusual for crime-scene photos to be "gruesome, grisly, [or] unpleasant." *Id.*

¶50. Exhibits S-14 E and G are autopsy photographs depicting the injury to Harris's skull and brain. Dr. LeVaughn described Exhibit S-14 E as "a photograph after the top of the skull bone is removed and also the brain is removed, so we're looking at in this photograph what we call the base of the skull or the bottom part of the skull," and the photograph showed "a probe through the cranial cavity." Dr. LeVaughn testified that Exhibit S-14 G was "a view from the left side of the head" showing "the entry wound into the skull."

¶51. At trial, Thomas's theory of defense was that Harris shot himself while Thomas tried to stop him from committing suicide. The State's theory was that the entry wound to the back-left side of Harris's head and the subsequent wound path were consistent with a homicide. Testimony regarding the wound path was highly disputed at trial, with Thomas

20

objecting to Dr. LeVaughn's testimony that the wound path was "slightly upward" rather than "upward" as described in the report of Dr. Eserman, the medical examiner who performed the autopsy.[4]

¶52.    Because the photographs were relevant to the wound path, which was a disputed issue at trial, we cannot find that the circuit court erred in concluding that the probative value of the photographs outweighed their prejudicial effect. *See Martin*, 289 So. 3d at 705 (¶7) (stating that only "[s]ome probative value" is needed to support the admission of photographs into evidence (emphasis added)). This issue is without merit.

### VIII.    Cumulative Error

¶53.    Thomas argues that cumulative error deprived her of a fair trial. "Under the cumulative-error doctrine, individual harmless errors may be aggregated with other errors to create reversible error 'where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.'" *Warren v. State*, 187 So. 3d 616, 628 (¶34) (Miss. 2016) (quoting *Osborne v. State*, 54 So. 3d 841, 848 (¶27) (Miss. 2011)). However, "where there is no error in part, there can be no reversible error to the whole." *Id.* (quoting *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007)).

¶54.    We have identified no reversible error. Therefore, there can be no cumulative error. This issue is without merit. Thomas's conviction and sentence are affirmed.

---

[4] Dr. LeVaughn prepared his own report; however, Thomas moved to exclude any findings from Dr. LeVaughn's report because it was produced to the defense only four days before trial. The circuit court granted the motion on the basis that Dr. LeVaughn's report was not timely produced, and the circuit court limited Dr. LeVaughn's testimony to the findings in Dr. Eserman's report.

¶55.　**AFFIRMED.**

　　**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, WEDDLE AND ST. PÉ, JJ., CONCUR.  EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**